IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>R. GORDON JONES,<br><br>        Defendant. | **MEMORANDUM OPINION AND ORDER**<br><br><br>Case No. 1:13-CV-00163-BSJ<br><br>District Judge Bruce S. Jenkins |

This matter came before the court for bench trial, beginning on July 7, 2015 and continuing through July 10, 2015. Polly Atkinson and Mark Williams appeared on behalf of the Securities and Exchange Commission ("SEC" or "Commission"). J. Michael Coombs and Elliott N. Taylor appeared on behalf of R. Gordon Jones ("Jones").

Having considered the parties' briefs, the evidence presented, the arguments of counsel, and the relevant law, the court finds the SEC has sufficiently demonstrated that (i) under a valid 102(e) Bar Order, Jones was not allowed to practice before the SEC, and (ii) Jones did practice before the SEC during the prohibited time period and thereby violated the Bar Order. As such, the court GRANTS the SEC's request under Section 21(e) of the Exchange Act of 1934 ("Exchange Act") for an order requiring Jones to comply with his 102(e) Bar Order.

While finding Jones violated his Bar Order, the court is in doubt as to the appropriate remedy for such a violation. The court would appreciate further briefing and argument on the authority, the method, and the amount of an appropriate remedy to be applied in this case. Therefore, at this time, the court RESERVES on the SEC's request for disgorgement.

## BACKGROUND

Jones has been licensed as a Certified Public Accountant ("CPA") by the State of Utah since June 1980. In connection with Jones's work on the 1995 audit of Dynamic American Corporation, the SEC issued on May 4, 2001 an order against Jones pursuant to Rule 102(e) of the SEC's Rules of Practice.[1] The order—the "Jones Bar Order"—precludes Jones from appearing or practicing before the Commission. It states, in relevant part, as follows:

> Based on the foregoing, the Commission finds it appropriate and in the public interest to accept the Offer of Jones and impose the sanctions consented to therein. Accordingly, IT IS HEREBY ORDERED that, effective immediately,
>
> 1. Jones is denied the privilege of appearing or practicing before the Commission as an accountant.
>
> 2. After 3 years from the effective date of this order, Jones may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:
>
> a) preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission. Such an application must satisfy the Commission that Jones's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or
>
> b) an independent accountant. Such an application must satisfy the Commission that: (i) Jones, or the firm with which he is associated, is a member of the SEC Practice Section of the American Institute of Certified Public Accountants Division for CPA Firms ("SEC Practice Section"); (ii) Jones, or the firm, has received an unqualified report relating to his, or the firm's, most recent peer review conducted in accordance with the guidelines adopted by the SEC Practice Section; and (iii) As long as Jones appears or practices before the Commission as an independent accountant he will remain either a member of the SEC Practice Section or associated with a member firm of the SEC Practice Section, and will comply with all applicable SEC Practice Section requirements, including all requirements for periodic peer reviews, concurring partner reviews, and continuing professional education.

---

[1] See Ex. 136; see also Pretrial Order, filed Feb. 3, 2015 (CM/ECF No. 66), at 3.

Ex. 136.

Since 2001, Jones has been an employee of J&J Consultants LLC ("J&J").[2] J&J's business includes accounting and income tax services for clients.[3] A major J&J business area is the preparation and generation of financial statements for public companies.[4] Jones was the managing partner of J&J from 2001 through 2012.[5] After Jones switched from managing member to employee on January 1, 2012, Jones's day-to-day duties remained basically the same.[6] In addition to his salary, Jones also received distributions from J&J.[7] Before 2013, no other employee received distributions from J&J.[8] Prior to 2006, Jones owned at least 95 percent of J&J.[9] In 2006, Keith Elison joined J&J and Jones's ownership decreased to 75 percent.[10] Between 2006 and 2012, Jones's ownership decreased over time, though it is unclear by how much.[11]

Jones, since the date of the May 4, 2001 Jones Bar Order, has not been readmitted to practice before the SEC. Though Jones did apply to be re-admitted after initiation of this lawsuit, such application was denied on account of this lawsuit.[12]

---

[2] Hr'g Tr., at 154:23-25.

[3] See id. at 185:15-186:13.

[4] See id. at 186:14-187:21, 189:4-190:22, 191:2-17.

[5] See id. at 156:10-12.

[6] See id. at 156:13-157:12.

[7] See id. at 158:12-14.

[8] See id. at 158:15-17.

[9] See id. at 311:8-11.

[10] See id. at 311:12-17.

[11] See id. at 311:18-312:7.

[12] See Pretrial Order, filed Feb. 3, 2015 (CM/ECF No. 66), at 3.

## DISCUSSION

This case centers on three issues: (i) whether the SEC has the power to regulate those who practice before it; (ii) whether Jones impermissibly practiced before the SEC and thereby violated the Jones Bar Order; and (iii) the proper remedy for addressing any such Bar Order violation. The court will address each issue in turn.

## I.   Power to Regulate Practice Before the SEC

Under Section 23 of the Exchange Act, the SEC has the "power to make such rules and regulations as may be necessary or appropriate to implement the provisions of this chapter for which they are responsible or for the execution of the functions vested in them by this chapter."[13] Pursuant to such authority, the SEC promulgated Rule 102(e) of the Commission's Rules of Practice. Rule 102(e) states that the SEC "may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it in any way."[14] Given this statutory and regulatory footing, the court finds the SEC has authority to prohibit individuals from practicing before it.[15]

## II.   Jones's Practice Before the SEC

Having determined that the SEC has power to regulate practice before it, the court finds that in 2001, consistent with that power, the SEC entered the Jones Bar Order prohibiting Jones

---

[13] 15 U.S.C. § 78w(a)(1).

[14] 17 C.F.R. § 201.102(e)(1).

[15] As noted during the bench trial, the constitutionality of Rule 102(e) is not a matter before the court. *See* Hr'g Tr., at 375:9-12. For completeness, however, the court notes that four circuit courts have held that Rule 102(e) is valid: (i) the Second Circuit in *Touche Ross & Co. v. S.E.C.*, 609 F.2d 570, 582 (2d Cir. 1979); (ii) the Ninth Circuit in *Davy v. S.E.C.*, 792 F.2d 1418, 1421 (9th Cir. 1986); (iii) the Eleventh Circuit in *Sheldon v. S.E.C.*, 45 F.3d 1515, 1518 (11th Cir. 1995); and (iv) the District of Columbia Circuit in *Marrie v. S.E.C.*, 374 F.3d 1196, 1205-06 (D.C. Cir. 2004).

from practicing before it.[16] It is undisputed that Jones consented to entry of the Jones Bar Order.[17] To analyze whether Jones practiced before the SEC and thereby violated the Bar Order, the court will first examine generally what qualifies as practicing before the SEC. Second, the court will look at Jones's specific actions—namely, his involvement in preparing public company filings—and assess whether they fit within the general framework of practicing before the SEC. Third, the court will examine Jones's consent to his preparation work being incorporated into public filings. And fourth, the court will assess Jones's advice of counsel defense and its availability.

A. *Work Generally Qualifying as Practicing Before the SEC*

The SEC's Rules of Practice indicate that practicing before the SEC is a broad concept.[18] Under Rule 102(e), the Commission has broad power to deny a person "the privilege of appearing or practicing before it **in any way**."[19] This breadth is reinforced by Rule 102(f), which provides an expansive definition of practicing before the SEC:

> (f) Practice defined. For the purposes of these Rules of Practice, practicing before the Commission shall include, **but shall not be limited to:**
>
> > (1) Transacting any business with the Commission; and
> >
> > (2) The preparation of any statement, opinion or other paper by any attorney, accountant, engineer or other professional or expert, filed with the Commission in any registration statement,

---

[16]*See* Hr'g Tr., at 154:3-5; Ex. 136.

[17]See Hr'g Tr., at 154:6-14.

[18]During litigation, the SEC described the concept of practicing before it as intentionally broad in order to address the myriad of forms of improper accountant conduct. *See* Pl.'s Mot. for Summ. J., filed Sept. 19, 2014 (CM/ECF No. 47), at 11. Indeed, the SEC's expert witness, Lynn Turner, testified at trial as to the importance of breadth in protecting the efficacy of Rules 102(e) and 102(f). *See* Hr'g Tr., at 42:15-43:21, 136:16-139:16.

[19]17 C.F.R. § 201.102(e)(1) (emphasis added).

> notification, application, report or other document
> with the consent of such attorney, accountant,
> engineer or other professional or expert.

17 C.F.R. § 201.102 (emphasis added).

Two cases—*In the Matter of Robert W. Armstrong, III* and *S.E.C. v. Prince*—provide

additional insight into the behavior that generally qualifies as practice before the SEC. Given the

importance of these two cases, the court will provide a more detailed analysis of their underlying

facts.

In the 2005 SEC administrative proceeding *In the Matter of Robert W. Armstrong, III*,[20]

Robert Armstrong was a vice president and controller of National Medical Care, Inc. ("NMC"), a

subsidiary of the public company W.R. Grace & Co. ("Grace").[21] Previously, a SEC

administrative law judge ("ALJ") had determined that Armstrong improperly prepared NMC

financial data, and that he submitted it to Grace in furtherance of a scheme to manipulate Grace's

reported earnings.[22] But the ALJ had dismissed the Rule 102(e) claims against Armstrong,

finding that Armstrong did not appear or practice before the SEC "because he was not an officer

of a public company and did not prepare any of the reports that Grace filed with the Commission

because he did not actually draft them."[23] On appeal, the Commission in *Armstrong* disagreed

with the ALJ's dismissal of the Rule 102(e) claims, finding as follows:

> The text of the Rule does not specify that a person must sign a
> document filed with the Commission. Moreover, the term
> "preparation" of a document is, we believe, sufficiently broad to
> encompass the preparation of data to be included in a document
> filed with the Commission, at least where, as here, the data was

---

[20] 2005 WL 1498425 (June 24, 2005).

[21] *Id.* at *1-2.

[22] *Id.* at *1.

[23] *Id.* at *11.

prepared for the express purpose of being included in such a document.

The law judge's holding would allow accountants to escape discipline under Rule 102(e) simply by instructing someone else to draft, sign, and file fraudulent documents. The Rule, however, recognizes that financial statements often incorporate information created, compiled, or edited by accountants who are not responsible for signing or filing the financial statements. Thus, practicing before the Commission includes computing the figures and supplying the data incorporated into Commission filings and consenting to their incorporation. As a result, Armstrong appeared and practiced before the Commission because he computed the amounts of income needed to be held in reserve to achieve Grace's targeted growth rates, prepared the materially false financial reports based on these figures, and submitted this information to Grace knowing that Grace would incorporate it into its Commission filings. Armstrong consented to the inclusion of these figures because he reviewed Grace's draft financial statements containing these figures, confirmed that the figures reconciled with the numbers that he had submitted, and suggested no changes to the numbers.

We conclude that Armstrong in fact appeared or practiced before the Commission (assuming that Rule 102(e) imposes such a requirement) because he computed the figures and provided the data included in Grace's financial statements filed with the Commission and consented to the inclusion of this information. We further conclude that the Commission may discipline individuals pursuant to Rule 102(e) even if those individuals did not appear or practice before the Commission while committing willful violations of the securities laws.

*Armstrong*, 2005 WL 1498425, at *11-12. Thus, the Commission in *Armstrong* determined that

practicing before the SEC included preparing data incorporated into SEC filings, regardless of

whether the preparer physically signed the document filed with the SEC.[24]

---

[24] And as the U.S. District Court for the District of Columbia noted in *S.E.C. v. Brown*—a case related to the *S.E.C. v. Prince* case discussed hereafter—"[t]he Commission's interpretation in *Armstrong* of 'practicing before the Commission' is consistent with the language of Rule 102(f). Prince points to no past practices or pronouncements that are inconsistent with this interpretation. Consequently, it is reasonable, especially in view of the purpose of Rule 102(e), to accord deference to the Commission's interpretation of it." 878 F.Supp.2d 109, 125-26 (D.D.C. 2012) (footnotes omitted) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)).

While the Commission in *Armstrong* determined that the SEC had the authority to deny Armstrong the privilege of appearing or practicing before it pursuant to Rule 102(e),[25] the Commission ultimately chose not to do so. Instead, it limited itself to ordering Armstrong to cease and desist from committing or causing any violations or future violations of the federal securities laws and rules.[26] Though, the Commission noted, the same factors that provided a basis for issuing the cease-and-desist order could provide a basis for disciplining Armstrong under Rule 102(e), "in light of the unique circumstances" of the case, it decided not to suspend Armstrong under Rule 102(e) "as an exercise of [the Commission's] equitable discretion."[27]

The more recent case, *S.E.C. v. Prince*,[28] out of the U.S. District Court for the District of Columbia, adopts the reasoning of *Armstrong* and provides additional insight into what generally qualifies as practicing before the SEC. In *Prince*, Gary Prince worked for Integral Systems, Inc. ("Integral").[29] In 1992, Prince became Vice President and Chief Financial Officer ("CFO") of Integral and acted with "final call" on accounting matters.[30] In 1993, the SEC filed suit against Prince for securities laws violations related to Prince's work as CFO of a different company, and in 1994 a judgment was entered prohibiting Prince from violating the securities laws in the future.[31] In 1995, Prince resigned as Director and CFO but continued to act as a consultant to

---

[25] *Armstrong*, 2005 WL 1498425, at *13.

[26] *Id.* at *14-15.

[27] *Id.* at 15.

[28] 942 F. Supp. 2d 108 (D.D.C. 2013).

[29] *See id.* at 113.

[30] *Id.*

[31] *Id.* at 113-14.

Integral.[32] In 1997, the SEC issued an order under Rule 102(e) permanently banning Prince from appearing or practicing before the Commission as an accountant.[33]

In 1998, Integral hired Prince as a full-time employee with the title "Director of Mergers and Acquisitions." Over the next few years, Prince's work with Integral included the following: (i) assessing the financial health of newly-acquired subsidiaries by investigating the subsidiary's financial statements and making suggestions on how they should record certain transactions;[34] (ii) writing a draft Management Discussion and Analysis ("MD&A") section of Integral's Form 10-Q and 10-K filings—these drafts were edited and Integral's CEO approved the final, filed version;[35] (iii) reviewing and commenting on drafts of public filings;[36] (iv) drafting financial press releases, particularly pre-earnings press releases;[37] and (v) occasionally interacting with the accounting department, including investigating how capital losses had been booked, creating a software development amortization plan, and assessing how the company should adopt new financial accounting standards.[38] In this work, Prince's suggestions or comments were not always followed, and other Integral employees had the final say.[39]

Although lengthy, the court finds the following *Prince* analysis useful:

> The Commission issued a Rule 102(e) Order against Prince in 1997. This Order permanently prohibits Prince from exercising "the privilege of appearing or practicing before the Commission as

---

[32]*Id.* at 114.

[33]*Id.*

[34]*Id.* at 116.

[35]*Id.* at 118.

[36]*Id.* at 118-19.

[37]*Id.* at 119.

[38]*Id.* at 120.

[39]*Id.* at 115, 118-20.

an accountant." For purposes of analysis, violation of this prohibition requires two elements. First, an individual must "appear[ ] or practice[ ] ... as an accountant." Second, such action must have occurred "before the Commission."

. . .

The evidence was undisputed that Prince reviewed and commented on drafts of Integral's public filings, including Form 10–Ks and Form 10–Qs. Prince also wrote the first draft of the MD & A section included in those filings. In addition, Prince engaged in discussions with members of the Integral accounting staff and the accounting staff at Integral subsidiaries regarding the financial statements. These activities clearly meet the second prong, in that they involve work done on various types of statements and documents "filed with the Commission." Thus, the question is whether these activities constitute "practicing accounting" before the Commission.

Rule 102(f) defines "practicing before the Commission" to include "[t]he preparation of any statement, opinion, or other paper by any ... accountant" if that document is filed with the Commission. The crux of this dispute turns on what the word "preparation" encompasses.

. . .

This Court has already observed that *Armstrong* "established that an individual may ... be found to have practiced before the Commission if he or she participated in the preparation of financial statements filed with the Commission by, for example, creating, compiling or editing information or data incorporated into [filings with the Commission] and consenting to their incorporation."

The language in *Armstrong* rejects the theory put forth by Prince's expert witness, Jonathan Macey, that only accounting department personnel and the executives who have final authority for financial disclosures are "practicing accounting."

. . .

This cramped definition ignores the language and spirit of *Armstrong*, which rejected the premise that only those who were "responsible for signing or filing the financial statements" were practicing accounting. Armstrong himself did not make the ultimate determination as to whether the information that he contributed would be included in the filings. In fact, he "voiced concerns" regarding the substance of the subsidiary's statements, but they were submitted despite his disagreement. Thus, the fact

that Prince did not have final authority over what information was included in Integral's filings with the SEC . . . is not dispositive.

Macey's definition ignores the fact that accounting is not a mechanistic, quantitative endeavor, but instead requires many non-quantitative decisions on which people can reasonably disagree. Because these non-quantitative decisions may greatly affect what final numbers are included in the financial statements, those who participate in making those decisions are "creating" and "compiling" the relevant information, even if they do not have final authority over the exact numbers that are included.

The record contains evidence showing that Prince engaged in such decisionmaking. For example, Prince sent an email to Brown and Pat Carey, Integral's controller, regarding the accrual of bonuses given to employees at SAT, one of Integral's subsidiaries. He wrote, "I have instructed Paul [SAT's controller] to accrue the bonuses in FY00 and to reverse the FY01 entries. Please make sure the consolidated numbers reflect this change also." Clearly, Prince was making an accounting determination for SAT, and then directing the Integral accounting staff to make sure that this number was reflected in the consolidated financial statements. Those financial statements were then filed with the SEC.

. . .

Similarly, Prince wrote to the controller of another Integral subsidiary, RT Logic, and opined on how the subsidiary should book certain journal entries in its closing financial statements. He made specific recommendations as to how certain items should be recorded. For example, he stated that a particular credit should be booked to additional paid-in capital rather than retained earnings and noted that a debit should flow through a particular expense. The closing financial statements were then included in a Form 8–K that Integral filed with the SEC.

. . .

In general, the implementation of Generally Accepted Accounting Principles ("GAAP") and the rules of the Financial Accounting Standards Board ("FASB") require complex decisions involving the exercise of accounting judgment. Thus, part of functioning as an accountant, and "creating, compiling, or editing" the information or data incorporated in a financial statement, is making such decisions.

. . .

> The emails demonstrate Prince "practicing accounting" by determining how particular data should be treated in the financial statements of Integral and its subsidiaries. Those statements were then incorporated in filings before the Commission . . . Thus, since Prince was practicing accounting by preparing financial data that was filed with the Commission, he violated the terms of his Accounting Bar.

942 F. Supp. 2d 108, 145-51 (D.D.C. 2013) (footnotes and citations omitted).

Rules 102(e) and 102(f) and the *Armstrong* and *Prince* cases illustrate the breadth of what qualifies as practicing before the Commission, including creating, compiling, or editing information or data incorporated into filings with the SEC; participating in non-quantitative accounting decisions; and implementing GAAP and FASB standards. And such work qualifies, regardless of whether an individual actually signs the documents filed with the SEC or has final decision making authority over them.

B. *Jones's Specific Preparation Work*

Having dealt with what generally qualifies as practicing before the Commission, the court now turns to Jones's specific behavior to analyze whether Jones violated the Bar Order. After considering the record, the court finds that Jones's involvement in preparing financial statements and related disclosures qualifies as practicing before the SEC and violates the Bar Order.[40]

The court will not undertake an exhaustive recital of every form of Jones's prohibited preparation work, every instance of such work, or every company for which Jones engaged in such work. Instead the court focuses on examples sufficient to demonstrate that Jones did in fact engage in conduct prohibited and thereby violative of the Jones Bar Order, including (i) creating, compiling, or editing information incorporated into filings with the Commission, (ii) making

---

[40]The court notes that during his investigative testimony, Jones was asked, "Do you believe that the work that you have done at J&J over the past several years does not fall under the rubric of being a preparer or reviewer?" After some clarification that the question was directed at what Jones thought as of that day, Jones responded in his investigative testimony, "As of today, my understanding and my belief is that it is a violation." *See* Hr'g Tr., at 184:3-185:14.

non-quantitative accounting decisions, (iii) drafting responses to SEC comment letters, and (iv) managing others involved in the preparation of materials filed with the SEC.[41]

    (i)    <u>Creating, Compiling, or Editing Information Incorporated into Filings</u>

       There is no dispute that Jones personally participated in the preparation of financial statements for public companies. Jones's counsel stated during trial that "we have admitted from day one, Mr. Jones has never, ever denied that he was preparing financial statements for public companies. So we do admit that."[42] In addition, Jones specifically admitted to working on 10-K's for public companies.[43] He admitted to working on 10-Q's for public companies.[44] He admitted to working on 10-KSB's for public companies.[45] He admitted to working on the pro forma financials for an 8-K filing.[46] He admitted to writing the MD&A[47] for public companies on

---

    [41]The court notes Jones's point that it is unclear what amount of contribution is necessary before an individual is involved in "preparing" a financial statement. *See* Def.'s Mot. for Summ. J. of Dismissal and Supporting Mem., filed Aug. 12, 2014 (CM/ECF No. 41) at 10 n.7. However, like the District Court for the District of Columbia in *Prince*, the court finds that it need not delve into the challenging question of how expansively "prepare" can be interpreted, because there is substantial evidence in the record of Jones practicing before the SEC under the standards set forth in *Armstrong* and *Prince*. *See Prince*, 942 F. Supp. 2d 108, 148 n.25 (D.D.C. 2013). *See also* Hr'g Tr., at 134:7-135:12.

    [42]Hr'g Tr., at 574:25-575:5. The court notes that instead of contesting that he prepared financial statements for public companies, Jones makes two other arguments under Rule 102(f): (i) that the SEC has not shown that Jones transacted business with the Commission, and (ii) that the SEC has not shown that Jones consented to the financial statements he prepared being filed with the SEC. *See* Hr'g Tr., at 575:3-20. The court finds that Jones's first argument is based on a misreading of Rule 102(f) and the *Armstrong* and *Prince* cases. Rule 102(f) does not require that an accountant both transact business with the Commission *and* prepare financial statements for that accountant to be practicing before the Commission. Such an interpretation ignores the important language in Rule 102(f) that practicing before the Commission includes "but shall not be limited to" the examples provided. Jones's first argument also ignores *Armstrong* and *Prince*, both of which find that the preparation of financial statements, in and of itself, qualifies as practicing before the Commission. Regarding Jones's second argument, the court finds that Jones both prepared financial statements and consented to their filing with the Commission. Jones's consent will be further discussed later in this opinion.

    [43]See *id.* at 195:21-23; *see also* Ex. 97; Ex. 166.

    [44]*See* Hr'g Tr., at 194:17-22, 212:6-213:2, 317:19-319:1; *see also* Ex. 119; Ex. 127; Ex. 178; Ex. 185.

    [45]*See* Hr'g Tr., at 205:22-206:9, 208:20-209:8, 218:8-219:11; *see also* Ex. 167; Ex. 173; Ex. 215.

    [46]*See* Hr'g Tr., at 210:3-18; *see also* Ex. 97.

multiple occasions,[48] and he specifically admitted to writing the MD&A for Anoteros, Inc. ("Anoteros") that was included in Anoteros's 10-K for the period ending December 31, 2007.[49] Jones admitted to working on statements of cash flows, which are part of a company's financial statement.[50] And Jones admitted to personally drafting footnotes for financial statements.[51]

Jones's personal participation in the preparation of public company financial statements and related disclosures filed with the SEC squarely qualifies as practicing before the Commission. The *Armstrong* and *Prince* cases are clear: an individual practices before the SEC if he or she participates in the preparation of financial statements filed with the SEC by creating, compiling, or editing information incorporated into filings with the Commission.[52] Jones has admitted to such personal participation several times over, having admitted generally to preparing financial statements for public companies and having admitted specifically to preparing 10-K's, 10-Q's, 10-KSB's, an 8-K, MD&A's, statements of cash flows, and footnotes for public companies.[53]

Having practiced before the SEC, the court finds Jones violated the Jones Bar Order.

---

[47]A Management Discussion and Analysis ("MD&A") is a document written for inclusion in public filings and is derived from the financial statements. *See* Hr'g Tr., at 227:5-14. MD&A's are not audited. *See id.* at 227:15-17, 549:20-21.

[48]*See* Hr'g Tr. at 233:14-17.

[49]*See id.* at 227:18-229:9, 322:3-324:18; *see also* Ex. 129; Ex. 266.

[50]*See* Hr'g Tr., at 216:3-217:9; *see also* Ex. 212.

[51]*See* Hr'g Tr., at 221:8-13, *see also* Hr'g Tr., at 223:2-224:4, 225:1-226:21; Ex. 59, Ex. 183, Ex. 199, Ex. 207.

[52]*See Armstrong*, 2005 WL 1498425, at *11; *Prince*, 942 F. Supp. 2d 108, 147 (D.D.C. 2013).

[53]*See also, e.g.*, Ex. 177 (This exhibit contains an engagement letter from J&J to Zaldiva, Inc. The letter is signed by Gordon Jones and states that "[t]his letter is to outline our proposal for assisting your company in completing its 2009 SEC filings." The letter offers several services, including to "[d]raft the above reference financial statements and footnotes in accordance with [GAAP]," and to "[c]ommunicate with the Company's auditors during the course of the reviews and audit.").

(ii)  .  Non-Quantitative Accounting Decisions

The court finds Jones engaged in making non-quantitative accounting decisions and thereby practiced before the SEC. As previously noted, *Prince* stated that "accounting is not a mechanistic, quantitative endeavor, but instead requires many non-quantitative decisions on which people can reasonably disagree," and that "those who participate in making those decisions are 'creating' and 'compiling' the relevant information, even if they do not have final authority over the exact numbers that are included."[54] The U.S. District Court for the District of Columbia found that Prince engaged in such decision-making by advising how certain journal entries and accounting items should be treated.[55] Jones, in the present case, engaged in similar conduct. For example, in Exhibit 172, Jones provides Studio One Media, Inc. ("Studio One") advice about the appropriate time to amortize software. Jones acknowledged that Exhibit 172 is an example of him providing advice to a client about what kind of accounting to use.[56] And Jones acknowledged that his advice is going to affect multiple filings and multiple time periods.[57]

Exhibit 182 provides a similar example of Jones making non-quantitative accounting decisions and advising public companies accordingly. In Exhibit 182, Studio One seeks Jones's advice on the appropriate accounting treatment for a recent transaction where the amount Studio One paid a manufacturer differed from the amount Studio One had been carrying on its books. Jones advised that "the difference needs to be recorded under other income as a gain on

---

[54]*Prince*, 942 F. Supp. 2d 108, 148 (D.D.C. 2013).

[55]*See id.* at 148-50.

[56]Hr'g Tr., at 239:11-24.

[57]*Id.* at 239:25-240:6.

settlement of debt. It would not be appropriate to recognize it in a prior period. Is the result [sic]

of actions taken in the current period."[58] Jones testified at trial about Exhibit 182:

> Q. (By Ms. Atkinson)   And again, Mr. Jones, this is a company reaching out to you and asking for advice on how to account for specific transactions; isn't that right?
>
> A. That's correct.
>
> Q. This is one of those sophisticated issues that they're looking for your accounting expertise and your accounting guidance; isn't that right?
>
> A. Yes.
>
> Q.   And you provide that accounting guidance; isn't that right?
>
> A. I did.
>
> . . .
>
> Q. Right. So this was a decision about whether they needed to file a restatement or whether they didn't need to file a restatement, whether they could just record it in the current period?
>
> A. Correct.
>
> Q. And this decision affected the public companies financial statements?
>
> A. It did.
>
> Q. And it affected the public companies filings?
>
> A.   Yes.

Hr'g Tr., at 247:9-19, 248:13-22.

Jones's non-quantitative decision-making was not limited to issues raised by clients. In

addition to clients, Jones acknowledged that the auditors of clients also reached out to him from

---

[58]Ex. 182.

time to time with accounting questions.[59] For example, in Exhibit 186, auditor Chad Sadler asks

Jones about Omnitek Engineering Corp.'s research and development carry forward and whether

it mistakenly stayed the same from 2009. In response, Jones writes to Sadler as follows:

> The tax accounting and the book accounting for R&D is the same.
> R&D is expensed when incurred. This is not really a reconciling
> item between book and taxes. I don't know why HJ broke the
> number out from the total but I don't want to upset the apple cart
> with them. We should just leave it as it was shown for 2009 so that
> they can see that we didn't change their numbers then when we do
> the 2011 audit we can fix the presentation.

Ex. 186.[60]

Exhibit 193, a similar example, involves the company client BLVD Holdings, Inc.

("BLVD") and the auditors of Sadler, Gibb & Associates. Jones testified about Exhibit 193 at

trial:

> Q. (By Ms. Atkinson)   And the bottom e-mail from you, Mr.
> Jones, to Sadler Gibb, re:   Proposed changes to financials, you tell
> the auditors we don't need to put this 6/30/12 balance sheet with the
> 9/30/12 balance sheet because that is not BLVD's year end.   Do
> you see where I'm talking about?
>
> A. I do.
>
> Q. So this is you giving the auditors your opinion about the proper
> accounting here; isn't that right?
>
> A. That's correct.
>
> Q. Up above that, Mr. Neves from Sadler Gibbs says, has the
> company moved out of the development stage at this point?   This
> is your slash management's call.   And you say, at the very top of
> the page in your response to Mr. Neves, good question, let's leave it
> there for now.   Do you see where I'm talking about?
>
> A. Yes.

---

[59] *See* Hr'g Tr., at 250:12-252:9.

[60] *See also id.* at 252:21-254:8.

Q. That is you giving your opinion to the auditors; isn't that right?

A. It is.

Q. In fact, in that last e-mail where you're giving your opinion to the auditors, you don't copy that to the company; isn't that right?

A. I don't know. This looks like a whole e-mail chain all connected together but I have no way of knowing if that is the case or not.

Q. Well, let's look at it. So the e-mail is from Gordon Jones, sent Wednesday, December 5, 2012, to T. Neves at SadlerGibb.com, subject re: Proposed change to financials. This particular e-mail is not copied to the company; isn't that right?

A. I don't know. I'm not an expert on this.

Hr'g Tr., at 257:4-258:10.

These exhibits and testimony selections illustrate Jones's participation in non-quantitative accounting decisions.[61] And as indicated in *Prince*, this is a form of creating and compiling relevant information that qualifies as preparation of financial statements and practicing before the Commission. As such, the court finds Jones practiced before the Commission and thereby violated the Jones Bar Order.

(iii)   Response to SEC Comment Letters

As explained by the SEC expert witness Lynn Turner, the SEC is required by law to periodically review the public filings of all public companies.[62] And if, after review, the SEC has questions or comments or changes that need to be made to correct those filings, then the SEC

---

[61]Some other examples include Exhibits 164, 175, 176, 180, 181, and 189, which were discussed by the SEC and Jones during trial at Hr'g Tr., 238:14-239:10; 240:7-241:25; 243:15-245:2; 245:6-23; 245:24-247:1; and 254:9-255:1, respectively.

[62]Hr'g Tr., at 77:12-13.

writes a letter to the company raising those issues.[63] That letter from the SEC is referred to as a SEC comment letter.[64]

Jones admitted he was involved in the drafting of responses to SEC comment letters,[65] and the record shows as much. For example,[66] in Exhibit 188, Ann Courtney of BLVD writes to Jones about a SEC comment letter BLVD recently received. She writes, "Hi Gordon, thank you for the update regarding the auditors. I was also wondering if you had a chance to review the comments as I was hoping to get your feedback/response to the SEC."[67] Jones responds, "I read the comment letter. I am working on the answers to 44, 45 and 46 with the auditors. When would you like to discuss the other comments left to you by your attorney? Is there a number I can reach you at?"[68] Later, Jones writes to Courtney and her associate, "Attached are the responses to the SEC comments. Please provide the auditors a complete version of the amended S-1 prior to refiling."[69] Also included in Exhibit 188 are responses to comment letter questions 27, 28, and 39.[70] As indicated at trial, Jones testified during his investigative testimony that he believed he drafted those responses.[71]

---

[63]*See id.* at 77:13-25.

[64]*See id.* at 78:5-7.

[65]*See id.* at 267:24-268:9.

[66]At trial, the SEC also walked through Exhibits 60, 118, 120, 130, 179, 190, 195, 200, and 201 with Jones, which provide additional evidence that Jones was involved in drafting responses to SEC comment letters. *See* Hr'g Tr., at 268:10-270:25, 273:6-280:2.

[67]Ex. 188, at JONES-E00064581.

[68]*Id.* at JONES-E00064580, JONES-E00064581.

[69]*Id.* at JONES-E00064579.

[70]*Id.* at JONES-E00064583, JONES-E00064585.

[71]*See* Hr'g Tr., at 271:1-273:5.

Jones's involvement in preparing responses to SEC comment letters qualifies as practicing before the SEC. Preparing comment letter responses is analogous to responding to non-quantitative accounting questions from public companies or their auditors—which the court has already determined to be practicing before the SEC—except that the recipient of the feedback is the SEC itself. SEC comment letters and responses can impact how public companies draft filings in the future.[72] As noted in *Armstrong*, the SEC disciplines accountants under Rule 102(e) to "protect the integrity of its own processes."[73] "The reliability of the disclosure process is impaired if incompetent or unethical accountants are permitted to certify financial statements. The reliability of the disclosure process is equally impaired if such accountants are permitted to participate in the preparation of financial statements certified and filed with the Commission."[74] The same rationale applies to the preparation of comment letter responses—the reliability of the disclosure process is impaired if such accountants are permitted to respond to SEC corrections, comments, or questions about financial statements filed with the Commission.

The conclusion that Jones's involvement in preparing responses to SEC comment letters qualifies as practicing before the Commission is supported by Jones's own testimony. Jones testified that he did not participate in telephone conversations with SEC staff about SEC

---

[72]To illustrate, in Exhibit 179—a comment letter to Studio One—the SEC states, "We have reviewed the above referenced filings and have the following comments. *We ask you to revise future filings in response to some of these comments.* If you disagree, we will consider your explanation as to why a revision is unnecessary." Ex. 179, at T&E00212128 (emphasis added). And the court notes that the Studio One response to the SEC comment letter is one of the responses that Jones testified he believed he worked on. *See* Hr'g Tr., 270:18-25.

[73]*Armstrong*, 2005 WL 1498425, at *11 (quoting *Touche Ross & Co. v. SEC*, 609 F.2d 570, 582 (2d Cir. 1979)).

[74]*Id.* (footnotes omitted).

comment letters because he felt that doing so would violate the Bar Order.[75] It seems clear that if

telephone conversations with the SEC regarding SEC comment letters would violate the Bar

Order, then written responses directed to the SEC regarding SEC comment letters would

similarly violate the Bar Order.

Thus, the court finds Jones practiced before the SEC by participating in the preparation of

SEC comment letter responses, and he thereby violated the Jones Bar Order.[76]

(iv)    Management of Others

In addition to Jones's direct participation in the preparation of public company filings,

Jones also indirectly participated through his oversight of others. The record provides several

instances of such indirect involvement.

For example, several exhibits illustrate Jones's involvement through his management and

oversight of Kirk Gibb—a J&J employee. In Exhibit 215, Jones emails Kirk Gibb, "I have fixed

the financial statements for Studio One Media as attached. Please complete the notes now." In

his investigative testimony, Jones acknowledged that the email indicates that he reviewed Kirk

Gibb's initial draft of Studio One's financial statements and made some changes to it.[77] The

email also shows Jones instructing Kirk Gibb to complete the notes for Studio One Media.

Likewise, in Exhibit 217, Kirk Gibb emails David Rector of Standard Drilling regarding the

company's 10-Q filing. Kirk Gibb writes, "I'm just finishing up the final touches on the financial

---

[75]*See* Hr'g Tr., at 280:3-281:23.

[76]Though not a response to a SEC comment letter, the court finds Exhibit 125 noteworthy. In Exhibit 125, Jones emails auditor Mike Moore, with a copy to Keith Elison. The email has the subject "Re: PCAOB response for FUSA" and states, "Here are my responses to the FUSA comments. Keith please send me the response you prepared on Standard Drilling." Jones acknowledged at trial that ordinarily an auditor would be the one to respond to a PCAOB inquiry about an audit of a public company. *See* Hr'g Tr., at 266:25-267:23. *See also* Ex. 124; Hr'g Tr., at 266:16-24.

[77]*See* Hr'g Tr., at 218:8-219:11.

statements and then they'll go through Gordon's review."[78] Further, in Exhibit 219, Jones writes to Kirk Gibb, "How are the work papers coming along? Will you be able to send them to me soon?" Kirk Gibb responds to Jones—"My final draft. Please review."—and attaches Ethos Environmental, Inc.'s audit work papers.[79]

Other examples of Jones indirectly preparing public company filings include his oversight of Bradley Gibb and Keith Elison—both employees of J&J. For instance, in Exhibit 59, Bradley Gibb writes, "Here are the most recent accounting pronouncements for the Q's and K's going forward. Gordon went over it and its what should be what is included in all notes."[80] Similarly, in Exhibit 109, Jones directs Keith Elison,[81] stating, "I expect that you will have (at a minimum) the Asia4sale and Curatech audits finished before you come back from Las Vegas. I would also like the ARDCO and Franklin Mining audits completed if possible."[82] And later, in Exhibit 120, after Jones receives an email from the auditors about an accounting adjustment for the company Alpha Trade,[83] he instructs Keith Elison to "use this adjustment in responding to the SEC."[84]

---

[78] Ex. 217; *see also* Hr'g Tr., at 220:2-221:7.

[79] Ex. 220. Note: when asked about specific pages of Kirk Gibb's attached audit work papers (specifically, Jones was asked about pages T&E0026654 and T&E0026656 of Exhibit 220), Jones admitted that he recognized the pages as testing work papers that would normally be prepared by an auditor in the audit of a public company. *See* Hr'g Tr., at 264:11-266:15. These emails show Jones overseeing and reviewing Kirk Gibb's work, which, in this instance, appears to be work that would normally be performed by an auditor.

[80] Jones admitted that he is the "Gordon" identified and that "all notes" refers to footnotes to financial statements. *See* Hr'g Tr., at 226:2-21.

[81] *See* Hr'g Tr., at 263:11-264:10.

[82] Ex. 109.

[83] At the time of Exhibit 120, Kirk Gibb is an audit partner for Sadler, Gibb & Associates.

[84] *See* Ex. 120; Hr'g Tr., at 279:9-280:2.

Having analyzed the record, the court finds that Jones indirectly prepared materials filed with the SEC by instructing, reviewing, and/or overseeing the efforts of other individuals. By so doing, Jones practiced before the Commission and thereby violated the Jones Bar Order.

C. *Jones's Consent*

As previously noted, Rule 102(f) provides that "[t]he preparation of any statement, opinion or other paper by any attorney, accountant, engineer or other professional or expert, filed with the Commission in any registration statement, notification, application, report or other document *with the consent* of such attorney, accountant, engineer or other professional or expert," qualifies as practicing before the SEC.[85] Though Jones admits, and the court so finds, that he prepared financial statements for public companies, Jones argues that he did not violate the Bar Order because he did not consent to those materials being filed with the Commission.[86] The court disagrees.

Jones suggests consent under Rule 102(f) must be written consent,[87] where the preparer signs off on an item being filed with the SEC or being incorporated into items filed with the SEC. But such a construction of Rule 102(f) is directly contradicted by *Armstrong*. *Armstrong* states that Rule 102(f) "does not specify that a person must sign a document filed with the Commission. Moreover, the term 'preparation' of a document is, we believe, sufficiently broad to encompass the preparation of data to be included in a document filed with the Commission, at least where, as here, the data was prepared for the express purpose of being included in such a document."[88]

---

[85] 17 C.F.R. § 201.102(f)(2) (emphasis added).

[86] *See* Hr'g Tr., at 574:25-575:5.

[87] *See id.* at 16:23-17:15.

[88] *Armstrong*, 2005 WL 1498425, at *11.

The court likewise finds that written consent is not required under Rule 102(f). The court finds persuasive the reasoning of *Armstrong* that a more restrictive interpretation of Rule 102(f) "would allow accountants to escape discipline under Rule 102(e) simply by instructing someone else to draft, sign, and file fraudulent documents."[89] Instead, Rule 102(f) "recognizes that financial statements often incorporate information created, compiled, or edited by accountants who are not responsible for signing or filing the financial statements."[90]

Jones consented under Rule 102(f) because he prepared materials for public companies with the understanding and expectation that such information would be included in SEC filings. In *Prince*, the court found that "[t]he subject lines and substance of the emails show that Prince was fully aware that these calculations were going to be used in SEC filings."[91] The record amply demonstrates that the same can be said in the present case, as illustrated by the following four examples. First, in Exhibit 118, Jones receives an email from Keith Elison with the subject line "Standard Drilling SEC Comment Letter Response." The email attaches a proposed SEC comment letter response and asks for comments. Jones replies to the email, "Looks good to me too. Let's get this filed."[92]

Second, in Exhibit 193, auditor Tyler Neves sends an email to Jones with the subject line "RE: Proposed Changes to Financials." Neves asks Jones, "Has the Company has [sic] moved out of the development stage at this point, given the initial revenues earned (planned principle [sic] operations, etc). This is yours/managements call, but we thought it may be on the border of

---

[89]*Id.*

[90]*Id.*

[91]942 F. Supp. 2d 108, 149 (D.D.C. 2013).

[92]Ex. 118.

moving out of the development stage."[93] Jones responds, "Good question. Let's leave it there for now in case they don't have any more sales before the end of the year."[94]

Third, in Exhibit 171, auditor April McEniry of Moore & Associates sends an email to Kenneth Pinckard of Studio One with the subject line "RE: Studio One QE 12-31-07." The email states, "I sent all these to Gordon and we are just waiting to make sure he concurs before we give permission to file."[95] In his investigative testimony, Jones testified that this email is an example of auditors giving him and J&J the final review of SEC filings prior to filing.[96] He also testified that he believed this was the usual practice of Moore & Associates.[97]

Fourth, in Exhibit 178, Jones sends David Rector of Standard Drilling and auditor Mike Moore an email with the subject "Re: FW: Standard Drilling 10Q." Jones states, "Hi David, I removed the editorial comments made by the attorneys. I am forwarding this to Mike Moore. It looks good to go."[98]

The record, as exemplified by these four examples, demonstrates that Jones prepared materials with the understanding and expectation that such materials would be used in filings with the SEC. This understanding and expectation is consistent with the consent described in Rule 102(f)(2). As such, the court finds that Jones consented to his preparation work being used in public company filings with the Commission. By so doing, Jones practiced before the SEC and violated the Jones Bar Order.

---

[93]Ex. 193, at JONES-E00056671.

[94]*Id.*

[95]Ex. 171, at T&E00225952.

[96]*See* Hr'g Tr., at 260:7-261:13.

[97]*See id.* at 261:14-21.

[98]Ex. 178. Notably, Jones sent the email on Saturday, May 2, 2009 at about two o'clock in the afternoon. On Monday, May 4, 2009 at about seven o'clock in the morning, Mike Moore emails an associate what purports to be the Standard Drilling 10-Q final document. *See* Hr'g Tr., at 261:22-262:16.

D. *Advice of Counsel Defense*

Having established that Jones practiced before the SEC in violation of the Jones Bar

Order, the court addresses Jones's asserted defense that his actions were taken in good faith

reliance upon the advice of counsel.[99] Specifically, Jones argues that he relied on the advice of

three attorneys—Jacob Stein, Paul Moxley, and Wallace Boyack—that his work preparing

financial statements did not violate the Bar Order.[100]

The court finds this advice of counsel defense fails for two reasons. First, Jones's reliance

on counsel, reasonable or otherwise, is irrelevant to the matter at hand. Advice of counsel is

simply not a defense to violations of Rule 102(e) Bar Orders. The court finds nothing in Rule

102(e) that indicates scienter is relevant in establishing violations, and Jones has not identified

any case law indicating otherwise.[101] Indeed, instead of relying on case law, Jones argues that to

not require the SEC to demonstrate scienter "only makes sense if the Commission had bothered

to be fair and define the words 'prepare' or 'preparer' in Rule 102(f)."[102] This argument,

however, is misplaced for an important reason: Jones consented to the Bar Order.[103] His own

signature allowed the Bar Order to be entered against him.[104] If Jones felt the terms "prepare" or

---

[99]*See* Hr'g Tr., at 167:19-23, 578:21-580:3.

[100]*See id.* at 167:24-168:1, 172:20-173:11, 282:24-286:23, 287:24-289:20; Def. Jones's Trial Mem. for Trial Commencing on July 7, 2015 at 9:30 a.m., filed June 26, 2015 (CM/ECF No. 83), at 2-5 [hereinafter Def.'s Trial Mem.].

[101]*See Prince*, 942 F. Supp. 2d 108, 151 (D.D.C. 2013) ("Prince notes in his Post-Trial Brief that if he did practice accounting before the Commission, he 'did so in good faith reliance upon the advice of counsel.' However, Prince did not identify any caselaw requiring scienter to establish a violation of a Rule 102(e) Order.").

[102]*See* Def.'s Trial Mem., *supra* note 100, at 10.

[103]*See* Hr'g Tr., at 154:6-11.

[104]*See id.* at 154:12-14.

"preparer" in the Bar Order were unclear or overly broad, he could have walked away—he was not obligated to consent. But having so chosen, Jones is so bound.

Second, even if an advice of counsel defense were available to Jones, the court finds the defense fails because Jones has not carried his burden on the defense's elements. As the parties note,[105] Jones must demonstrate four elements to establish an advice of counsel defense: "(1) a request for advice of counsel on the legality of a proposed action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice from counsel that the action to be taken will be legal, and (4) reliance in good faith on counsel's advice."[106]

Jones's failure to demonstrate an advice of counsel defense is most readily seen with Wallace Boyack. Not only did Jones never call Boyack as a witness, Jones himself never identified at trial the advice Boyack purportedly gave him.[107] Exhibit 310, the only exhibit proffered and admitted into evidence that was actually drafted by Boyack, is a letter to the SEC—not to Jones. And, as noted at trial,[108] a letter directed to the SEC is not advice to Jones. Thus, without sufficient evidence of Boyack advising Jones that his preparation work was legal, and without sufficient evidence that Jones relied in good faith on such advice, the court finds Jones has not met the burden of an advice of counsel defense.

Jones's purported reliance on Jacob Stein's advice is also problematic. According to Jones, he told Stein he intended to prepare financial statements that were signed off by a CPA,[109]

---

[105]See Def.'s Trial Mem., *supra* note 100, at 9; Pl.'s Trial Br., filed July 1, 2015 (CM/ECF No. 88) at 16.

[106]*United States v. Wenger*, 427 F.3d 840, 853 (10th Cir. 2005) (quoting *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429 (10th Cir.1988)).

[107]*See, e.g.*, Hr'g Tr., at 344:21-348:11.

[108]*See id.* at 348:6-7.

[109]*See id.* at 172:20-24. At trial, Jones also suggested that his letter to Stein in Exhibit 303 contains the gist of what he told Stein about the work he intended to do after entry of the Bar Order. *See id.* at 283:12-19. In Exhibit

and Stein advised him that those services were not in violation of the Bar Order.[110] Importantly,
Stein did not testify at trial, and there is no documentation in the record of any advice from him
to Jones.[111] But assuming such advice occurred, there are still two major problems. First, there is
inadequate evidence that Jones fully disclosed to Stein all relevant facts regarding Jones's
significant role in the preparation of public company filings. In fact, Exhibit 304—Jones's
exhibit—suggests otherwise. Jones had directed Stein to contact Amy Norwood of the SEC
about Jones's work for Environment Oil Processing Technology, Inc. ("EOPT"),[112] and Exhibit
304 contains Stein's October 19, 2001 letter to Norwood. This letter does not indicate that Stein
understood the scope of preparation work Jones intended to participate in following the Jones
Bar Order. The letter refers to work Jones "performed" for EOPT—past tense. It does not
indicate that Jones's work for EOPT is ongoing.  The letter indicates that Jones's consulting
responsibilities with EOPT "included"—again, past tense—gathering EOPT's accounting data to
have its financial statements audited or reviewed by other CPA's. The letter only mentions
EOPT and does not indicate Jones intended to work for any other company.[113] This letter does
not seem to anticipate Jones's extensive involvement in the preparation of financial statements
for public companies, both in quantity and quality of work done.[114]

---

303, Jones writes to Stein, "My understanding is that you spoke to Bob Fusfeld the attorney representing the SEC
prior to my entering into the settlement with the SEC and that you told him of my concerns. Also I believe that the
settlement that you worked out with him prohibited me from auditing, reviewing or signing financial statements of
public companies for three years but not from preparing financial statements as long as they were signed off by a
CPA."

[110]*See* Hr'g Tr., at 173:7-11.

[111]*See id.* at 173:4-6, 177:8-12.

[112]*See id.* at 173:19-174:3; Ex. 303.

[113]*See* Hr'g Tr., at 176:16-18.

[114]The record contains no response to Exhibit 304's letter from Stein to Norwood, and Jones testified that
he did not know if Stein ever received a response. *See* Hr'g Tr., at  341:22-342:1.

The second problem is that there is inadequate evidence of Jones's good faith reliance on Stein's purported advice. Jones admits he read the Bar Order,[115] and the Bar Order states that after three years Jones could apply to resume practicing before the Commission as a "preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission."[116] But despite the inconsistency between this Bar Order language and Stein's alleged advice that Jones could prepare financial statements if they were signed off by a CPA, Jones never received—nor even sought—Stein's advice in a written legal opinion.[117] Under such circumstances, it is difficult to see how Jones could rely on Stein's advice in good faith.[118]

Similar issues make Paul Moxley's advice a problematic footing for an advice of counsel defense. Moxley is the only counsel that testified at trial.[119] He testified that in 2001, while negotiating the Bar Order, Jones told him that he wanted to continue functioning as a paraprofessional doing accounting work.[120] Moxley stated that he communicated Jones's desires to the SEC attorneys, and they said they would not express any opinions on it, but they did not

---

[115]*See* Hr'g Tr., at 159:4-10.

[116]Ex. 136.

[117]*See* Hr'g Tr., at 286:21-23, 300:16-301:1. Indeed, Jones did not seek a written legal opinion that his preparation work was proper, even after receiving word that an SEC attorney had stated that the SEC takes a "broad view" of what constitutes practice before the SEC. *See* Ex. 303; *see also* Hr'g Tr., at 352:1-353:11.

[118]Furthermore, the court notes Jones's testimony that he is "not aware of any case where a financial statement would be filed with the Commission that wasn't audited or reviewed by an auditor." Hr'g Tr., at 314:1-3. As noted by the SEC, the advice that Jones could prepare financial statements if they were signed off by a CPA—an independent auditor—does not make a lot of sense if all financial statements filed with the SEC are audited or reviewed by an auditor. *See id.* at 565:5-20. The exception would swallow the rule, and the Jones Bar Order language regarding Jones applying to resume practicing before the SEC as a preparer of financial statements would be superfluous.

[119]Jones also testified about his discussions with Moxley. *See* Hr'g Tr., at 182:10-183:13, 287:24-291:13, 301:2-302:21, 342:7-344:20.

[120]*See* Hr'g Tr., at 433:5-13.

see any problems with it.[121] Moxley also testified about discussions he had with Jones in 2004 about Jones reapplying to practice before the SEC.[122] Moxley believed that he acquiesced at that time that Jones could still practice as a paraprofessional.[123]

The evidence does not sufficiently demonstrate that Jones fully disclosed all relevant facts to Moxley or that Jones relied on Moxley's advice in good faith. As an initial matter, even assuming the SEC attorneys did tell Moxley that Jones's preparation work would not violate the Bar Order,[124] Jones could not rely in good faith on any advice that the SEC itself would see his preparation work the same way. Jones knew those SEC attorneys were not issuing an opinion on behalf of the SEC, and he knew their statements would not be put in writing.[125] And even more important, Jones also knew that, in his Offer of Settlement, he represented that his Offer was made voluntarily and that "no offers, promises, threats or inducements of any kind have been made by the Commission, or any member, officer, employee, agent or representative of the Commission in consideration of this Offer or otherwise to induce him to submit this Offer."[126] Additionally, Jones could not rely in good faith on advice from Moxley that Jones's preparation work did not violate the Bar Order, because Jones never retained Moxley to give him a written opinion that he could do such.[127] In fact, Moxley testified that in the cases he gets, there is not

---

[121]See id. at 433:21-25.

[122]See id. at 434:19-436:12.

[123]See id. at 436:13-16.

[124]For purposes of this decision, the court need not determine whether these comments were made, or, if made, whether they were made to Stein, Moxley, or both. But the court notes the testimony of Robert Fusfeld that he would not have told Jones or his attorney that Jones could engage in certain conduct after the Bar Order. See Hr'g Tr., at 541:21-542:2.

[125]See Hr'g Tr., at 286:3-20, 442:13-23.

[126]Ex. 136-A, at 4.

[127]See Hr'g Tr., at 301:6-11, 302:17-21, 445:10-22.

usually a lot of mystery that his clients violated the securities laws, but that if there were close questions he would bring in a transactional lawyer.[128] When asked, "Is your habit and practice, then, if an individual comes and seeks a specific legal opinion on rules and regulations that you would then bring in a transactional attorney?" Moxley responded, "Well, it would depend on what it was. But I'd be very reluctant to write any opinions."[129] Thus, when the SEC responded to the 2004 reapplication inquiry by reiterating that Jones could not currently practice before the SEC as a preparer of public company financial statements,[130] Jones did not have and did not seek a written opinion from Moxley to the contrary. Indeed, Moxley testified that he did not remember discussing with Jones what it meant to be a preparer or a person responsible for the preparation of a public company's financial statements.[131]

Moreover, although it appears Moxley had a general sense that Jones would be preparing financial statements for public companies,[132] it does not seem Moxley understood the extent of Jones's involvement. After testifying that he did not recall Jones telling him that he would direct auditors to present financial statements in development stage formats, that he would draft unaudited MD&A's, or that he would draft unaudited pro forma financial statements, Moxley testified "Frankly, if he would have, it wouldn't have meant anything to me."[133]

---

[128]*See id.* at 447:6-14.

[129]*See id.* at 447:15-20.

[130]*See* Ex. 306 ("The terms of the suspension order provide that Jones' application to resume appearing or practicing before the Commission *as a preparer or reviewer, or a person responsible for the preparation or review, of financial statements of a public company to be filed with the Commission* must make a showing that his work will be reviewed by the independent audit committee of the company for which he works or in some other manner acceptable to the Commission.").

[131]*See* Hr'g Tr., at 441:16-20.

[132]*See id.* at 448:8-451:4.

[133]*See id.* at 454:13-455:4.

Thus, the court concludes that reliance on counsel is not a defense to violations of Rule 102(e) Bar Orders, but, even if it were, the defense is similarly unavailable to Jones because he failed to show that the elements of the defense were met.

### III.  Proper Remedy for Jones's Bar Order Violation

The court now turns to the SEC's request that Jones's profits from his Bar Order violation be disgorged. Though the court finds Jones practiced before the SEC and thereby violated his Bar Order, the court is in doubt as to the appropriate remedy for such a violation. The court would appreciate further briefing and argument on the authority, the method, and the amount of an appropriate remedy to be applied in this case. At this time, the court will continue to reserve on the disgorgement or remedy issue.

### CONCLUSION

The court finds that (i) under a valid 102(e) Bar Order, Jones was not allowed to practice before the SEC, and (ii) Jones did practice before the SEC during the prohibited time period and thereby violated such Bar Order.

Having so found, the court hereby ORDERS, pursuant to Section 21(e) of the Exchange Act, Jones to comply with the May 4, 2001 Jones Bar Order.

The court RESERVES on the question of disgorgement or remedy and directs the parties to file the requested briefing on the authority, the method, and the amount of an appropriate remedy to be applied in this case. The SEC shall file within twenty days from the date of this opinion, and Defendant within twenty days thereafter.

DATED this _30_ day of September, 2015.

Bruce S. Jenkins
United States Senior District Judge

32