J. MICHAEL COOMBS, ESQ., Utah Bar No. 3639
MABEY & COOMBS, L.C.
3098 South Highland Drive, Suite 323
Salt Lake City, UT 84106-6001
Telephone: 801-467-2779
Fax No. 801-467-3256
jmcoombs@sisna.com

ELLIOTT N. TAYLOR, ESQ., Utah Bar No. 5151
TAYLOR AND ASSOCIATES, INC.
6313 Shenandoah Park Avenue
Salt Lake City, UT 84121
Telephone: 801-207-8272
Fax No. 801-606-2779
elliott@taylorlaw.org

ATTORNEYS FOR DEFENDANT

| IN AND BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>v.<br><br>R. GORDON JONES,<br><br>         Defendant. | **DEFENDANT JONES'S POST-TRIAL DISGORGEMENT MEMORANDUM**<br><br><br>Case No. 1:13-cv-00163-BSJ<br><br>Judge Bruce S. Jenkins |

Defendant R. Gordon Jones ("Jones"), by and through counsel, pursuant to instructions at the end of the Court's Memorandum Opinion and Order dated September 30, 2015, and in response to the Plaintiff, Securities and Exchange Commission's October 20, 2015, post-trial disgorgement memorandum, submits the following post-trial disgorgement memorandum.

## INTRODUCTION

The Commission devotes the lion's share of its disgorgement memo to the proposition that federal courts have the power to grant equitable relief and that "disgorgement"—the additional remedy it seeks—is a form of equitable relief. But Jones has never disputed these two academic points. This is not the issue. The real issue is whether this court's equitable relief powers should be further exercised by additionally awarding the Commission *money*. The Commission obtained the equitable relief it is entitled to receive in this matter on September 30, 2015 in the court's Memorandum Decision and Order when it obtained both the declaratory and injunctive relief it sought under § 21(e) of the Exchange Act. These are equitable remedies and the court has no obligation to impose additional remedies beyond the scope of § 21(e). That is to say, relief under § 21(e) is all that Congress has authorized federal courts to award the Commission in proceedings of this nature. No mention is made in § 21(e) of "disgorgement" or "equitable monetary awards" being a remedy available to the Commission. As a result of the court's September 30, 2015, Memorandum Decision and Order, the Commission now has the ability to seek contempt of court if Jones is found to have violated the September 30, 2015, Order in the future.[1]  Being able to get contempt is not an insignificant remedy in the Commission's favor. The issue is thus whether the Commission, in addition to receiving all the § 21(e) relief it could have gotten and also getting the future ability to move the court for an order to show cause for possible contempt, is <u>further</u> entitled to *money*. As set forth below, there is no statutory or other basis in this case for the additional imposition of an "equitable monetary remedy"—a seeming oxymoron—whether it is labeled "disgorgement" or something else.

---

[1] For this reason, the Commission's discussion at the end of its disgorgement memo about how unfair it would be to the Commission for the court to "vacate" the May 2001 bar order and have the Commission start over again in another administrative proceeding against Jones makes little practical sense. The Commission is far better off in the posture it is in now.

**Counterpoint I—THE COURT NEEDS TO RULE ON JONES'S OUTSTANDING TRIAL MOTION TO DISMISS THE COMMISSION'S DISGORGEMENT CLAIM BROUGHT AFTER THE CLOSE OF THE COMMISSION'S CASE-IN-CHIEF, A MOTION THE COURT HELD IN RESERVE.**

After the close of the Commission's case-in-chief, Jones made a motion to dismiss the Commission's claim of disgorgement on the ground that the Commission had put on insufficient evidence of any amount. *See* Trial Transcript, Docket Entry No. 103, p. 41, lines 20-25; p. 42, lines 1-25; p. 43, lines 1-14. *In fact, the Commission put on no evidence of a disgorgement amount at all in its case in chief.*[2] As the Court will recall, the Commission called two witnesses in its case-in-chief, namely, its expert, Lynn Turner, and Jones himself. Turner testified that Jones violated the bar order as to 21 public companies. *That is all that Turner testified to.* He did not testify as to the propriety of disgorgement or any disgorgement amount nor was anything of the kind in his expert report. Jones, at the same time, for the two days he was on the witness stand, had no personal knowledge, recollection or other ability to testify as to types and percentages of work he performed for public companies over the years; nor what his income had been only in regard to *that* specific work. Having put on no evidence of a disgorgement amount in its case-in-chief, on p. 16 of its memo, the Commission states:

> Jones testified that, based on his knowledge of the business, approximately 50 percent of his company's business was, and had been during the relevant period, financial statement preparation work. Trial Tr. at p. 187. He further testified that 60 percent of that financial statement preparation work was for public companies and that an additional 30 percent of financial statement preparation work was for private companies that intended to go public. Trial Tr. at p. 190.

---

[2] *See* Trial Trans., Docket Entry No. 104-1, pp. 36-38.

3

> Defendant's Exhibit 319 indicates that Jones income
> from his company from 2008 to 2013 was $1,487,097.[3]

There are several things wrong and highly improper if not unethical with the foregoing

excerpt from the Commission's memo.  First, this is not what Jones testified to *at trial*, let alone

in the Commission's case-in-chief.  It is therefore not true or accurate.  Jones had no recollection

of specific work percentage particulars at trial and said so.[4]  Nor was he capable of tying that

work to specific income amounts.  The Commission's excerpt above demonstrates the same old

problem we have had in this case at the summary judgment level.  It is convoluted testimony

from Jones's investigative deposition taken in 2011, 4 years ago.  Significantly, when Ms.

Atkinson, the Commission's counsel, later in the trial moved the court to admit Mr. Jones's

investigative deposition testimony so that the foregoing Commission summary might be

legitimately included as evidence in this case, the court sustained Jones's objection.  The court

ruled that Jones's investigative deposition testimony was inadmissible because Jones was

present.  Trial Trans., Docket Entry No. 102-2, p. 1, lines 8-25; p. 2, line 1-2 (denying admission

of Exhibit 2 into evidence).  The fact is that Jones's investigative testimony excerpt was in

response to a question regarding the services J&J Consulting, LLC performed for public

companies.  It is irrelevant to what percentage or kind of work Jones performed himself.  The

response therefore fails to identify the type and extent of services Jones rendered that relate to

---

[3] This fallacious application of percentages to Jones, individually, as opposed to the entire company, J&J
Consultants, LLC ("J&J"), is reiterated again on p. 21 of the Commission's disgorgement memorandum
and is no less erroneous.  The Commission has perpetuated this fallacy from Jones's investigative
deposition testimony throughout this litigation and did so in its 2014 cross-motion for summary judgment.
It is simply one of those red herrings that will never go away, as if attributing all of J&J's actions to Jones
long enough and repeatedly enough will somehow make it true.

[4] For example, at Trial Trans., Docket Entry No. 102, p. 27, lines 4-7, Jones testified on cross-
examination as follows:

> Q.  Of the financial statement preparation work
> that J&J performed, approximately 60 percent of
> that was for public companies; isn't that correct?
> A.  I have no knowledge of that.

4

the kind of conduct the court found to be in violation of the bar order.  The Commission put on

no evidence of that whatsoever.  More to the point, the investigative testimony summarized

above has to do with the entire business of J&J, not Jones specifically.  J&J had several

employees who did public company-related accounting work.  What the Commission has done is

taken investigative deposition testimony from 2011 that related to all the employees of J&J and,

as it did in its motion for summary judgment in late 2014, try to shoehorn that formula onto

Jones, individually.  As such, it is a non-sequitur.  There was no investigative or trial testimony

from Jones or anyone else that the type and percentage of services provided by other J&J

employees to J&J's public or private clients were similar or identical to the type and percentages

provided by Jones.  Just as importantly, the investigative testimony paraphrased above makes no

differentiation as to financial statements prepared for private companies, individuals,

partnerships and public companies.  This is a second Commission non-sequitur.  Instead, Jones

testified in his investigative deposition and at trial that he also performed a substantial amount of

tax consulting, tax return preparation work, and provided general corporate formation tax

counseling and bookkeeping advice for a host of clients.

The record is clear that when Jones's counsel made the subject motion to dismiss, the

court held a ruling in reserve on the ground that the Commission had put on evidence of his

income through his personal income tax returns.  *See* Trial Trans., Docket Entry No. 103, p. 41,

lines 20-25; p. 42, lines 1-25; p. 43, lines 1-14.  But Jones's tax returns, without anything more,

are not evidence of a disgorgement amount.  Because the Commission put on no disgorgement

evidence in its case-in-chief, either through Turner or any other witness, it failed to prove the

same or even create a presumption for Jones to rebut and therefore, Jones's motion to dismiss

should be granted and the Commission's claim for disgorgement should be dismissed.

5

**Counterpoint II—DISGORGEMENT OR AN "EQUITABLE MONETARY REMEDY" IS <u>NOT</u> AN APPROPRIATE OR PROPER REMEDY IN THIS CASE FOR SEVERAL REASONS.**

A.     <u>At closing argument, the court indicated that it viewed the case as a breach of contract case.  Because there is no such thing as "equitable monetary relief" under written contract law, the equitable remedy of "disgorgement" here is inapplicable.</u>  Jones and the Commission had a written agreement which was his Offer of Settlement accepted by the Commission in April 1, 2001.[5]  And Jones, as determined by the court's September 30, 2015, Memorandum Opinion and Order, has been held to have breached that written agreement.  The question the court asked at closing argument is:  What is the consequence or effect of such a breach?[6]  Jones now answers that question two-fold.

One answer is the relief that the Commission was given on September 30, 2015, in the court's Memorandum Opinion and Order.  That ruling gives the Commission all it wanted and could get under § 21(e) of the Exchange Act, a provision specifically setting forth the type of equitable relief the Commission is entitled to receive when it seeks enforcement of an administrative bar order.  *That* is the relief that the Commission is entitled to receive by federal statute in the event of a breach of a bar order agreement.

A second way of answering the court's closing argument question requires looking at the actual language of Jones's agreement with the Commission itself.  This is the April 1, 2001, Offer of Settlement, Trial Exhibit 136A.  Therein, on p. 5, ¶ 5 C, the agreement, in addressing a possible breach, provides:

---

[5] This document was admitted into evidence at trial as Exhibit 136A.  *See* Trial Trans., Docket Entry No. 104, p. 43, lines 9-25, p. 44, lines 1-11.

[6] *See* Trial Trans., Docket Entry No. 104-1, pp. 38-41.

> If Jones breaches this agreement, the Division of
> Enforcement may petition the Commission to
> vacate the Order and restore this proceeding to its
> active docket.

This agreement is the Commission's form of consent agreement. It was drafted by the Commission. It contains the language *the Commission* wanted. The Commission chose the declared remedy in the document, which is the prospect of hauling Jones back in before the Commission in Washington DC to possibly face additional disciplinary action. Now the Commission complains that it would be severely prejudiced if its declared remedy against Jones (*i.e.*, the remedy agreed to by the Commission and Jones in writing) were enforced and the Commission was limited to bringing a new action against Jones based on events that gave rise to the initial bar order. Yet the Commission sees no prejudice to Jones by bringing an action more than 12 years later and seeking so-called "equitable relief" outside the four-corners of the written Offer of Settlement Agreement. The Commission just as easily could have included language in the agreement that it would bring a § 21(e) proceeding in federal court in the event of a breach and would also seek all salary and earnings garnered in breach of the agreement as forfeitable "disgorgement." Nowhere does the agreement mention "disgorgement" or even money damages, let alone "equitable monetary relief." Nowhere does it contain a so-called "liquidated damages" clause, which would be an agreement on the part of Jones to pay a set amount of money in the event he breached the agreement, a provision that may have caused Jones to reject the agreement. *The question is: why is the Commission trying to add a specific remedy to a written agreement—an agreement it drafted—that just isn't there and wasn't agreed to?*

Aside from the foregoing, for relief to be deemed *equitable*, there must be a victim. The relief must be necessary to make restitution to a specific victim. It must also involve "unjust enrichment" and an "ill-gotten gain," that is, getting something for nothing or by means of a

fraud or deception.  Disgorgement is thus a restitutionary remedy, designed to deprive wrongdoers of unjust enrichment and to deter others from violating securities laws.[7]  These principles are inapplicable to an administrative adjudicative bar order.  Here, the Commission wants disgorgement in a non-fraud setting and when there was no accusation or proof of a violation, by Jones, of the federal securities laws, only of an administrative bar order.  The disgorgement sought by the Commission here is improper because it would not serve as an equitable remedy, but rather as a damages remedy at law when the Commission has not been damaged.  The Supreme Court's analysis in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), provides guidance as to which forms of restitution are equitable and which are available at law.  The Court described restitution in equity as an instance where a plaintiff could identify money or property (1) "as belonging in good conscience to the plaintiff" and that (2) "could clearly be traced to particular funds or property in the defendant's possession" so that a court could order a defendant to transfer title or give a security interest to the plaintiff "who was, in the eyes of equity, the true owner."[8]  "[F]or restitution to lie in equity, the action generally must seek not to impose a personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."[9]  In this case, the Commission does not allege that the monies received by Jones from J&J's clients belong to the Commission, that the Commission otherwise owns these monies, that the Commission earned them and has been deprived of such monies, or even that the specific monies belong to victimized investors.  Rather, the disgorgement sought by the Commission appears to be a remedy at law, *i.e.*, "a judgment

---

[7] *E.g. SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998); *SEC v. Hughes Capital Corp.*, 124 F.2d 449, 455 (3d Cir. 1997).

[8] *Great-West*, 534 U.S. 204, 213-14 (2002).

[9] *Id.* at 214.

imposing a merely personal liability upon the defendant to pay a sum of money."[10]   This is not

to ignore that the disgorgement case law also shows that it is a remedy reserved for violations of

the federal securities laws.[11]   This remedy is inappropriate here since the Commission neither

alleged nor proved that Jones violated any securities laws (unlike the 3 cases it cites in support of

a disgorgement award which peripherally involved fraud, *see* Argument B below).

Jones's research in the Tenth Circuit also reveals that Jones would have to have been

"unjustly enriched" or received an "ill-gotten gain" or "illicit profits" *in violation of the federal*

*securities laws* before the Commission would be entitled to obtain disgorgement from him.[12]

**B.**      **Ordering Jones to pay money to the Commission for his violation of an**

**administrative bar order has no legal precedent and is anything but "routine."**   With all due

respect, the Commission's memo borders on brazen dishonesty when it contends that "[c]ourts

routinely order disgorgement for violations of Commission bar orders."  Comm. Disg. Memo, p.

8, top. This is not true in the least.  In support of this proposition, the Commission cites but three

cases, two of which are relatively old and involve barred stockbrokers engaging in fraudulent

activity, and none of which are similar to the case at bar.  The following explains.

In *SEC v. Taber*, 2013 U.S. Dist. LEXIS 172286; 2013 WL 6335375, at *2 (SDNY Dec.

4, 2013), essentially a default judgment consent case, a federal district court rubberstamped the

---

[10] *Id*. at 213 (citations omitted); *see also* Russell G. Ryan, "The Equity Façade of SEC Disgorgement," *Harvard Bus. L. Rev. Online* (2013), a copy of which is attached hereto as **Exhibit "A".**

[11] *SEC v. Clark*, 915 F.2d 439, 453 (9th Cir. 1990).

[12] *SEC v. Curshen*, 372 Fed. Appx. 872, 883; 2010 U.S. App. LEXIS 7555 at 28-29 (10th Cir. 2010); *Morgan Stanley Capital Group, Inc. v. Public Utility District No. 1 of Snohomish County, Washington*, 554 U.S. 527, 538; 128 S. Ct. 2733, 2741; 171 L. Ed. 2d 607, 617; 2008 U.S. LEXIS 5266 (US Sup. Ct. 2008) (referencing the Commission's disgorgement abilities but only in terms of "disgorgement of [illicit] profits"); *see also SEC v. Autocorp Equities, Inc*., 292 F. Supp. 2d 1310, 1330; 2003 U.S. Dist. LEXIS 22030, at p. 54 (DC Utah 2003) (federal courts have equitable powers to order disgorgement of "fraudulently obtained profits.").

Commission's application without objection by Defendant Taber, who, while "partially handicapped as a result of a large brain tumor that was surgically removed in March of 2013," appeared in the action *pro se* and by telephone.  Aside from being ill and perhaps dying, Taber had no counsel and couldn't afford any.  In fact, if one reviews Taber's financial declaration on PACER, Docket Entry No. 14, filed Oct. 18, 2013, p. 6 thereof, Taber's personal balance sheet showed less than $250 in total assets (cash in his bank account) and a negative net worth of nearly $415,000.  Taber lacked any ability to pay the Commission any part of a $400,000 disgorgement award but the Commission obviously demanded imposition of a high fine figure nonetheless.[13]   Because the amount imposed on Mr. Taber was uncollectible and the Commission knew it, we can only conclude that it was for publicity, that is, to make the Commission look competent and powerful.  Still, two additional facts distinguish *Taber* from the case at bar.  Taber's 2004 Bar Order "was based on a fraud injunction obtained against him in *SEC v. Del Global Techs. Corp.*, 04 CV 4092 (SDNY filed June 1, 2004), for his participation in a fraudulent scheme as the chief financial officer of a New York-based company."[14]   By sharp contrast, Jones has never been found, let alone accused, of participating in a securities fraud (*i.e.*, a violation of the federal securities laws) as an accountant or otherwise.  Secondly, it turns out that the Commission had earlier waived disgorgement for which Taber was liable in 2004.  The fact that Taber had earlier participated in a fraudulent stock scheme and had never paid the price for that was a principal consideration for the court imposing disgorgement on Mr. Taber some-nine years after his accounting bar.  *Id.* at *8.  Nothing of the kind can be said of Jones.

---

[13] It is also noteworthy that the *Taber* Court declined to assess prejudgment interest as the Commission now argues for the first time here in its disgorgement memo and which it never sought at trial.  *See* Jones's Argument IV below discussing this issue.

[14] SEC Litigation Release No. 22887 / SEC Accounting and Auditing Enforcement Release No. 3517 / December 12, 2013, http://www.sec.gov/litigation/litreleases/2013/ltr2287.htm

*SEC v. Martino*, 255 F. Supp. 2d 268, 289 (SDNY 2003), is even more inapplicable. There, a barred stockbroker named Martino engaged in illegal brokerage activities and participated in a stock manipulation scheme of the stock of a company named Titanic. She illegally brokered over $20 million in illegal off-shore Regulation S stock transactions and received almost $4.5 million of "ill-gotten gain" commissions for her solicitations and brokerage efforts. In short, she engaged in "repeated and flagrant violations of the securities laws," not just her bar order. Contrary to what the Commission would have this court believe, Ms. Martino was *not* ordered to disgorge $4.5 million merely on account of violating her bar order.

*In SEC v. Telsey*, 1991 U.S. Dist. LEXIS 21780; 1991 WL 72854, at *2 (SDNY March 13, 1991), the court imposed disgorgement on a barred stockbroker who, having been barred from "association with a broker-dealer," continued to work as a stockbroker for four different securities firms after his bar order. He came in the firm's offices every day, had his own desk and telephone, took calls, generated new business for the firms, solicited transactions, filled out order tickets, made markets and actually traded for the firm's proprietary trading account. He also lied and deceived customers by telling them that he was a principal in one or more of the firms when he was not. The court also found that his attempts to conceal his illegal commissions (*i.e.*, receiving commissions when a person is not "registered" also being separately illegal) showed that he was conscious of wrongdoing. Nothing here is similar to Jones. *Telsey* is also legally insignificant in that Shepardizing the case reveals that in nearly 25 years, it has only been cited in two cases, neither of which involved, imposed or discussed disgorgement.[15]

A mere three cases imposing disgorgement in a bar order violation proceeding and when each involved fraud or dishonesty of some kind, none of which is similar to Jones and two of

---

[15] *SEC v. Zahareas*, 100 F. Supp. 2d 1148, 1153; 2000 U.S. Dist. LEXIS 8901 (D. Minn. 2000) (not mentioning disgorgement); *AXA Distribs., LLC v. Bullard*, 2008 U.S. Dist. LEXIS 103837, at p. 42; 2008 WL 5411940 (MD Ala. Dec. 24, 2008) (not mentioning disgorgement).

which involved stockbrokers dealing with customers' money, is anything but "routine" as the Commission plainly represents in its memo. The Commission's argument that there is legal precedent for what it seeks from Jones is patently untrue.

**C.     Disgorgement is not supported by either *Armstrong* or *Prince*, the leading cases on accountant bar orders.** As is clear from the court's September 30, 2015 Memorandum Opinion and Order, the court, in determining Jones's liability for violating his bar order, gave substantial deference to the precedential value of *In re Robert Armstrong III*, 2005 WL 1498425 (June 24, 2005), and *SEC v. Prince*, 942 F. Supp. 2d 108 (D.D.C. 2013).  Yet neither of these two cases imposed disgorgement or any other "equitable monetary remedy."

In *Armstrong*, Armstrong acted as controller of a WR Grace subsidiary. WR Grace engaged in a scheme to artificially inflate its "reserves" and thus its income by $22 million. Mr. Armstrong assisted in that scheme by "cooking the books." This was discovered and an SEC administrative Rule 102(e) proceeding was brought against him. After administrative appeal to the full Commission, no disgorgement was ordered even though Mr. Armstrong was enjoined from violating federal securities laws and Commission rules. *Armstrong*, at *31. The Commission also went on to *not* suspend him from practicing as an accountant. *Id.* at *32.

In *Prince*, Prince had been barred from practicing accounting before the Commission under 102(e) and was later employed by a public company in its accounting department. A lady in the department took maternity leave and Prince then proceeded to run the entire accounting department, essentially acting as CFO. Jones, by contrast, never acted as a CFO after his bar. CFOs certify financial statements for the issuer under Sarbanes-Oxley (SOX). Not only was Prince barred under 102(e) but he had earlier served time in jail. His lawyer told him NOT to "prepare" financial statements. He did anyway. Prince also maintained a post-bar website where

he held himself out as a CFO for hire. The court held that he violated his bar order but exonerated him on other charges. Like the Commission in *Armstrong*, and while more egregious or flagrant than anything the court found that Jones did, the *Prince* Court ordered no disgorgement.

If neither Armstrong nor Prince had to disgorge earnings as accountants when their conduct was more flagrant and brazen than Jones's and in which they assisted in fraud and dishonesty and arguably caused actual harm to investors—something Jones never did—there is no justifiable basis to impose disgorgement on Jones here.

**D.**     **Jones's earnings or salary and for which there was a *quid pro quo* with third parties is not disgorgeable.**  Several cases hold that the Commission cannot obtain disgorgement of legitimate earnings or salary.[16]  This is something the Commission fails to address in its memo. The Commission has repeatedly cited and relied on *United States v. Nacchio,* 573 F.3d 1062,1079 (10th Cir. 2009), for the proposition that it is entitled to disgorgement in this case but *Nacchio* held that the purpose of disgorgement is to deprive securities law violators of their "ill-gotten gains."  Because of the *quid pro quo*, legitimate earnings or salary, by definition, are not "ill-gotten gain" or "unjust enrichment."  Let us not forget that this is a § 21(e) proceeding under the Exchange Act.  As such, it involves an effort

---

[16] *SEC v. Todd*, 2007 U.S. Dist. LEXIS 38985 (SD Cal., May 30, 2007) (SEC request for disgorgement of officers' salaries denied as "punitive"); *SEC v. Cohen*, 2007 U.S. Dist. LEXIS 28934 at *64-65 (E.D. Mo., April 19, 2007) (disgorgement not ordered where SEC failed to show that defendant benefited from securities violation through salary, bonuses, or stock sales); *SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) (dismissing claim for disgorgement where SEC argued that defendant generally was compensated for performance, but SEC did not identify any specific elements of compensation that were disgorgeable); *SEC v. Savino*, 2006 U.S. Dist. LEXIS 6357, at *51-52 (S.D.N.Y. Feb. 17, 2006), *remanded*, 2006 U.S. App. LEXIS 30193 (2nd Cir., Dec. 6, 2006) (in illegal kickback case, disgorgement of commissions earned from fraud, but not of salesman's entire salary, rejecting SEC argument that defendant was only retained because of his ability to generate commissions); *SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045 (SD Ind. 2005) (balancing fact that defendants provided "real and valuable services" with fact that, but for the fraud, the business would have collapsed earlier and they would not have been employed, and ordering each defendant to disgorge one-half of base salary for one year).

solely to enforce an administrative adjudicative order.  No violation of the federal securities laws was alleged or proven against Jones in either the Commission's Complaint or in the earlier administrative proceeding.  Disgorgement is therefore inapplicable and inappropriate.[17]

**E.**     **Since disgorgement is not an equitable remedy in this case, it is necessarily a "civil fine, penalty or forfeiture," perhaps even a criminal remedy.  As such, it is barred by the 5-year statute of limitations in *SEC v. Gabelli*.**   As set forth above, imposing "disgorgement" on Jones in this particular case would not be an "equitable remedy."  As such, the US Supreme Court has defined it as a "civil fine, penalty or forfeiture, pecuniary or otherwise" that must be brought within five years of the date the claim arose.[18]   *See Gabelli v. SEC*, 133 S. Ct. 1216, 1219; 2013 U.S. LEXIS 1861 at *6 (Feb. 27, 2013) (interpreting 28 USCS § 2462 titled "Time for commencing proceedings").   Under *Gabelli*, the Commission, being an investigative agency, is charged with knowing <u>when</u> Jones violated his bar order.  There is no discovery rule.  Nonetheless, the evidence at trial was that the Commission would have had knowledge of such as long ago as October 2001 when Jones hired Attorney Jacob Stein to write an inquiry letter to Amy Norwood of the SEC concerning Jones's activities.[19]   Yet the Commission waited until November 2013 or some-12 years later to bring this action against Jones, perhaps in order to purposefully argue for a more oppressive disgorgement amount.

---

[17] Jones's research reveals that Congress has authorized the Commission to seek disgorgement in administrative proceedings brought before it but Congress has not specifically authorized federal district courts to award disgorgement in Commission proceedings.  *See* footnote 10 above, citing the Russell Ryan article, a copy of which is attached hereto as **Exhibit "A"**.  That said, if the Commission didn't seek to impose disgorgement on Jones in the administrative proceeding in the event Jones violated the administrative bar order, or even mention it, it doesn't make much sense that this court should.

[18] Disgorgement in this case would be a "penalty" because *Gabelli* defines it as going beyond compensation; it is intended to punish Jones and label him a wrongdoer, not to restore the status quo. *Gabelli,supra* at 1223.  Let us not forget that in trial, the Commission sought nearly $1 million in disgorgement from Jones, an amount not the least necessary to *restore* any status quo.

[19] The Stein Letter was admitted into evidence at trial as Exhibit 304

Subsequent to *Gabelli*, the US District Court for the Southern District of Florida, in *SEC v. Graham*, 21 F. Supp. 3d 1300; 2014 US Dist. LEXIS 64953; 2014 WL 1891418 (DS Fla. 2014), dismissed the Commission's entire enforcement action holding that (1) seeking a declaration that the defendants were wrongdoers relegated the SEC's remedies to a penalty, (2) barring defendants permanently from an activity is "intended to punish," and (3) disgorgement is a forfeiture.  The *Graham* court thus went beyond *Gabelli* by dismissing even equitable claims for relief that were over 5 years old.[20]

**F.      Public policy militates against creating a precedent for the Commission to seek money from barred professionals with a vengeance, the very reason the Commission brought this case, focused on disgorgement and refused to settle.**  The unwillingness of the Commission to settle this case and to instead force Jones to spend what money and individual resources he had to go to trial reveals that this is and has been a "test case" for the Commission. Regardless of what has been represented, it is clear to Jones that the Commission wants a ruling that disgorgement is valid and justified in any § 21(e) bar order proceeding.  But this is what Congress should decide, not the courts.  Such a result shouldn't be created by case law alone.  If this court delivers that kind of result, the Commission stands to impose havoc and pain on a multitude of individuals who have consented to industry bar orders.  A ruling imposing disgorgement here could invigorate the Commission to subpoena tax returns of barred individuals, asking them to explain where and how they got their income.  Jones submits that this should not be the effect of this court case and that the court should be mindful of the Pandora's Box it shall open if it rules in the Commission's favor on disgorgement.

---

[20] While the Commission has previously cited *Broadbent v. Advantage Software*, 2011 U.S. App. LEXIS 4206 (10th Cir. 2011), for the proposition that equitable claims brought in Commission actions are not subject to a statute of limitations, both *Graham* and the case at bar are distinguishable. *Broadbent* involved an equity receivership *and* a Ponzi scheme.  In *Broadbent*, the trial court concluded that a strict application of statute of limitations favored one claimant over other claimants.  In seeking to treat all claimants the same, the Tenth Circuit Court of Appeals held that what the lower court did was fair.

**Counterpoint III—THE COMMISSION FAILED TO *PROVE* A DISGORGEMENT AMOUNT AT TRIAL BY "REASONABLE APPROXIMATION" OR OTHERWISE.**

  **A.**   **The Commission's sole reliance on the "reasonable approximation of profits" standard to prove a disgorgement amount does not apply in this case.** There is no dispute that the Commission has the burden to prove a disgorgement amount and courts do not award disgorgement amounts the Commission is unable to prove. *SEC v. Boyd*, 2011 U.S. Dist LEXIS 79533, at *45; 2011 WL 3020923 (D. Colo. 2011).[21] That said, the Commission argues that its obligation to prove a disgorgement amount becomes relaxed when the records needed to prove an amount are unavailable or if made available, are indecipherable. In such event, its obligation is only to show a "reasonable approximation of the profits." Comm. Disg. Memo, p. 15 (citing *First City Financial*, 890 F.2d at 1232, and *SEC v. Patel*, 61 F.3d 137, 139). Ignoring that Jones earned what he received and had no illicit "profits" or "unjust enrichment," the "reasonable approximation of profits" standard is a court-created fallback position to cover situations where the defendant has lost or deliberately destroyed, misplaced or purposely maintained bad records, all in order to prevent the Commission from being able to prove a disgorgement amount. *Id.* While this is the law, the Commission put on no evidence that J&J's billings and other records were so bad, incomplete or indecipherable—and purposefully so—that it couldn't provide a disgorgement expert report of its own and thus carry its own normal trial burden. To be sure, Donna Walker, the Commission's expert disgorgement witness sprung on Jones as a so-called

---

[21] "Forfeitures serve a variety of purposes, but are designed primarily to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct." *United States v. Ursery*, 518 U.S. 267, 284, 116 S. Ct. 2135, 135 L. Ed. 2d 549 (1996). The burden of proof is on the government to establish, by a preponderance of the evidence that the property at issue is subject to forfeiture. *United States v. Wagoner County Real Estate*, 278 F. 3d 1091, 1097 (10th Cir. 2002) (civil forfeiture proceeding pursuant to 18 U. S. C. § 983(c)(1)); *United States v. Voigt*, 89 F. 3d 1050 (3rd Cir. 1996), *cert. denied*, 519 U.S. 1047, 117 S. Ct. 623, 136 L. Ed. 2d 546 (1996) (applying preponderance standard to 18 U. S. C. § 982(a) civil forfeiture proceedings). *United States v. Adegboye*, 2011 U.S. Dist. LEXIS 122084, *3-4, 2011 WL 5025531 (WD Okla., Oct. 21, 2011).

"summary witness" a week before trial, appeared to have little trouble creating Excel

Spreadsheets of various disgorgement amounts from J&J's QuickBooks records once the

Commission's counsel got an epiphany and was suddenly able to give Walker search and

calculation parameters.[22]   The question one must seriously ask is why the Commission was

unwilling to provide this Rule 26(a)(2) information to Jones at the exchange of expert report

stage of this litigation.

   The Commission has had *all* of J&J's accounting and QuickBooks records since 2011,

records supplemented through 2013.  Since it commenced this suit in 2013, it has had ample time

and opportunity to take Jones's and J&J depositions and go over the J&J QuickBooks entries and

understand what Jones and/or J&J did, how and why they coded various entries as they did, how

time was kept, and how clients were billed.  But it chose not to.[23]  At no time did the

Commission issue an affirmative report calculating what it believed Jones, individually, made

from violating his bar order.  In the Commission's case-in-chief, it put on evidence that Jones

violated the bar order as to 21 public companies only.  Yet two days later, Donna Walker took

the stand long after the close of the Commission's case and, as a purported "summary witness,"

testified as to what SEC-related work Jones did not only for Turner's 21 companies but myriad

other companies as well, thereby going far beyond the 21 identified by the Commission in its

case-in-chief.[24]

---

[22] Trial Tran., Docket Entry No. 104, pp. 6, lines 11-12 (Ms. Walker testified, "You [Commission counsel, Polly Atkinson] had directed me to prepare summaries and perform calculations . . ..").

[23] Jones is not aware of any law that requires a person to keep more precise and complete records in case he or she gets investigated by the SEC versus the kind of records he or she must keep for the IRS but that seems to be the basis of the Commission's position in this case, or at least the "reasonable approximation" standard.

[24] Jones objected to Walker testifying as to more than the 21 companies identified by Turner but the court allowed the admission of this evidence on the ground that it related to "the question of practice." Trial Trans., Docket Entry No. 104, p. 9, lines 1-16 and p. 16, lines 5-13.  This does not mean it shouldn't now

The Commission wants it both ways here:  It contends that J&J's QuickBooks information provided years before trial was so deficient or lacking in comprehensibility to invoke the "reasonable approximation of profits" standard but wasn't deficient enough that the court shouldn't embrace Donna Walker's expert disgorgement testimony in which she claims she was able, with Ms. Atkinson's help, to know the correct parameters and then properly code and understand every "SEC-related" entry and come up with a gargantuan disgorgement figure.  For the foregoing reasons, the Commission did not meet its disgorgement burden of proof at trial.

**B.**      **The Commission sandbagged Jones on June 25, 2015, some-10 days before trial, with an undisclosed surprise disgorgement expert disguised as a purported "summary witness."  Despite this underhanded trial tactic, Donna Walker's methodology assumed false premises and was inaccurate, unreliable and untrustworthy.**  On June 25, some-10 days before trial, the Commission, by email, suddenly designated an SEC accountant, Donna Walker, as a "summary witness."  But Ms. Walker was no "summary witness" at all.  She was instead an expert disgorgement witness that should have been timely disclosed under Rule 26(a)(2) and presented during the presentation of the Commission's case-in-chief.  A summary witness is not allowed to offer opinion evidence, rather such a witness is limited to merely confirming how a summary document purportedly summarizes underlying documents.  That is not what Ms. Walker did.  Further, and very importantly, the Commission called Ms. Walker to the witness stand to prove a disgorgement amount 2 days *after* it had rested its case.[25]  Jones was not given the opportunity to depose Ms. Walker prior to the trial.  As detailed previously,

---

be excluded and ignored for another purpose, that is, being used to somehow show a disgorgement amount.

[25] *See* Trial Trans., Docket Entry No. 103, p. 41, lines 9-15; *see also* Trial Trans., Docket Entry No. 104-1, pp. 36-38.

Walker's position in the trial sequence and with respect to the Commission's burden of proof is not a trivial point and cannot be ignored.

Walker acknowledged in her testimony that she tried to look up what companies in J&J's records were "public" and which were "SEC filers."[26]  Such application of professional research to data goes beyond merely "summarizing" records.  The court must ignore the evidence resulting from the analytical procedures applied by Walker as she was not offered or qualified as an expert.  She further testified as to conclusions she made as to QuickBooks entries based solely on parameters given her by the Commission's counsel, Polly Atkinson.  This task involved analysis and making professional assumptions and conclusions.  Trial Tran., Docket Entry No. 104, pp. 5-33.  Yet none of these coding parameters or its methodology had been confirmed by Jones or J&J in a deposition or at trial as accurate and correct.  As per instructions from Atkinson, Walker coded notations on J&J's QuickBooks files such as all "consultation" entries as "SEC-related" and thereupon charged these entries, among who-knows-how-many others, to Jones, thereby coming up with an exorbitant disgorgement figure of nearly $917,000.  Moreover, on p. 32 of the Trial Transcript, Walker testifies:

> A.  You [Polly Atkinson] directed me to multiply the total taxable
> income from R. Gordon Jones, PC by the SEC related
> work percentage that I had previously calculated.
> Q.  Okay.  And did you do that for each of the years
> between 2008 and 2013?
> A.  Yes.

How Walker came up with "an SEC-related work percentage for Gordon Jones" was never explained in her trial testimony, and is certainly not contained in any underlying documents from which Walker was supposed to merely create a summary.  Perhaps more importantly, she also went beyond the 21 companies Turner identified in the Commission's case-in-chief that, in his

---

[26] *See* Trial Trans., Docket No. 104, p. 8 (testifying on lines 20-21 that she went to www.sec.gov to search company names and had been given other source information by the Commission she didn't corroborate).

opinion, were tied to a violation of the bar order, companies that were left unidentified in Walker's testimony. There is simply no basis in the evidence, or in trial procedure, for Walker as a designated "summary witness" to expand beyond the 21 companies and with catch-all entry categories like "consultation" that were never corroborated by Jones, J&J or anyone else

Now that we have the benefit of the court's September 30, 2015, Memorandum Opinion and Order, it is clear that Walker's parameters and methodology lacked a nexus to the specific categories of violation set forth by the court in such Memorandum Opinion and Order. On p. 12 thereof, the court held that Jones's "preparation work" in violation of the bar order fell in these 4 categories: (1) Creating, Compiling, or Editing Information Incorporated into Filings; (2) Non-Quantitative Accounting Decisions; (3) Response to SEC Comment Letters; and (4) Management of Others. What Atkinson had Walker do instead was identify, evaluate and determine which QuickBooks entries had something involving "SEC" or "consultation" in them. Throwing any entry in the mix that says "consultation" or any entry that appears, in her discretion, to be "SEC-related" shows a lack of nexus to the 4 categories above and Jones's actual violation of the bar order.[27]

Proof of the error of Walker's methodology also lies in its conclusion. She concludes that Jones should disgorge $916,926 (*see* Comm. Disg. Memo, p. 21) and yet Jones only reported income in his tax returns during the same period of after tax taxable income of $1,151,330 and after tax taxable income without salary of $731,938,[28] Walker thus attributed 80% of Jones' net income to public company-related accounting work. If one backs out or subtracts salary, Walker attributed over 100% of Jones's net income to public company-related accounting. Attributing

---

[27] This is not to ignore that Walker's conclusions beyond Turner's 21 companies were speculative, beyond the competency of a "summary witness," were based on the false assumption that accounting entries coded as "consultation," for example, were *all* public-company related and that they also related to Jones, individually, conclusions wholly unsupported by the evidence.

[28] *See* Jones's Trial Exhibit 318, right-hand column, the two entries at the bottom of the page.

these kinds of inflated accounting work percentages to Jones is contrary to the evidence that J&J

employees did a substantial amount of SEC-related accounting work over the years on their own.

It is also far higher than the percentage assumptions that the Commission makes in the J&J

excerpts summarized from Jones's investigative testimony and falsely ascribed to Jones,

individually.  *See* Argument I and footnote 3 above; Comm. Disg. Memo, p. 16 and 21.  Because

Walker's testimony shows inadequate control or parameter procedures to ensure against not

erroneously attributing virtually *all* public company-related work of J&J to Jones or in coding

every Jones entry titled "consultation" as "SEC-related," not to mention myriad other

unidentified Jones entries as "SEC-related," it is unreliable and cannot be trusted.[29]   Walker was

thus incompetent to reach the conclusions she reached as a "summary witness" or otherwise.

Her testimony should be excluded or ignored in ruling on a disgorgement amount.

     C.     <u>Should any disgorgement amount be awarded, the amount should be</u>

<u>between the range of $27,722 and $81,464 as set forth on Jones's expert's Exhibit 319.</u>

Confusion exists, particularly as a result of Walker's testimony, as to when any disgorgement

period would commence.  During Walker's direct examination, Jones pointed out that the period

is limited to 2008 through 2013 due to the fact that the Commission's trial brief provides that it

begins in 2008.  Docket Entry No. 104, p. 20, lines 22-25; p. 21, lines 1-18.  After the break that

day, the court returned to the bench and confirmed that Jones was correct.  Trial Trans., Docket

Entry No. 104-1, p. 10, lines 15-16 (noting on p. 15 thereof that the Commission's trial brief

seeks disgorgement starting in 2008).  As per the transcript, the court then ruled that the period in

issue starts in 2008.  *Id.* at p. 11, lines 10-25; p. 12, lines 1-6.

---

[29] To Atkinson and Walker, "SEC-related" work could mean *any* accounting work for a public company regardless of whether it was tax consulting, preparing state and federal income tax returns, IRS withholding and payroll work, consultations in that regard, or even internal bookkeeping advice and counseling, much of which Jones testified that he did.

Jones hired his own expert, Mr. Daniel Rondeau, to offer rebuttal testimony to the Commission's absence of a disgorgement theory or amount. This court should not use Jones's rebuttal expert as a substitute for the Commission's failure to meet its own proof obligation and present affirmative evidence of a disgorgement amount in its case-in-chief. Nor should it be allowed to use a "summary witness" to otherwise avoid its own burden of proof.[30] Notwithstanding this effort and putting aside, for now, that disgorgement is inapplicable to this case as argued above, Mr. Rondeau's Exhibit 320 (also received as Commission Exhibit 264) sets forth a range of disgorgement amounts on the basis of *including* all work done by Jones on Turner's 21 companies, regardless of type of work. Jones's expert, Mr. Rondeau, did this to provide the court with an upper range in the event that the court were to rule that *all* accounting work done by Jones for the 21 public companies identified by Turner were in violation of his bar order. But Jones's reading of the court's September 30, 2015, Memorandum Decision and Order is that it is not. Instead, the court identified the four (4) categories of "preparation" referenced above. This renders Exhibit 320 inaccurate as a basis for a disgorgement amount, leaving us with Mr. Rondeau's Exhibit 319. Exhibit 319, which codes for public company financial statement preparation-related work done by Jones for the 21 Turner companies, has an upper range of $82,464 and a lower range of $27,722. The lower range backs out income taxes Jones paid on the income he so received and further backs out his salary, which Jones argues cannot lawfully be disgorged. The Commission, however, argues that income taxes paid on the amount received cannot be deducted from the overall "ill-gotten gain" or "unjust enrichment" total.

---

[30] *See Kendall Lakes Towers Condo. Ass'n v. Pacific Insurance Company*, 2011 US Dist. LEXIS 146270 (SD Fla. 2011), in which the Federal District Court for the Southern District of Florida struck the plaintiff's expert rebuttal report the plaintiff was attempting to use to prove its case in chief because it had neglected to identify an expert as part of its burden of proof in its case in chief. As a result, like the Commission here, the plaintiff tried to slide the expert in as a "rebuttal expert" at the last minute. This tactic was not permitted.

Comm. Disg. Memo, p. 19.  But the Commission cites no Tenth Circuit case for this proposition.

Furthermore, the *SEC v. Zwick* case cited on p. 19 of the Memo talks about withholding

disgorgement for the defendant's "general income taxes."[31]   Exhibit 319 does not withhold

disgorgement for "general income taxes" nor is Jones arguing that result.  Exhibit 319 deducts

for income taxes paid solely on what Jones actually received in connection with the 21

companies.  This makes sense because Jones didn't benefit from money that he eventually had to

pay in taxes.  Likewise, it is widely recognized that Americans do not consider that paying taxes

is a personal benefit.  If taxes paid are not deducted, then the amount disgorged would be more

than the amount benefitted or received.  If this happens, the remedy becomes punitive.  *Is it not*

*an oxymoron to force someone to disgorge or forfeit money he or she didn't actually keep?*

On p. 19 of its Memo, the Commission does not argue that Jones's J&J salary should *not*

be excluded or deducted from any calculation of what he might be ordered to disgorge.  For this

reason, there is no reason to address that issue.  Jones's salary as a J&J employee/member should

thus be excluded from any disgorgeable amount.  *See* Argument II, D above.  That is to say,

because Jones was engaging in substantial activity not subject to the bar order, he would have

earned a reasonable salary anyway.  The Commission has also not challenged the reasonableness

of Jones's salary in its memorandum or at trial.

Based on the foregoing, if the court should find that a disgorgement penalty against Jones

is applicable, then it should do so on the basis of the evidence presented at trial.  Doing so

creates the proper nexus between the evidence and the penalty imposed.  The evidence before the

---

[31] Furthermore, in the *SEC v. Svoboda* case which the Commission cites on p. 19, bott., of its disgorgement memo, the court claimed the defendant failed to cite any authority supporting his effort to deduct capital gains from his illicit trading profits.  That issue is not applicable here.

court is Mr. Turner's testimony of 21 companies and Mr. Rondeau's testimony and related

Exhibit 319.  The following chart summarizes the evidence presented at trial:

| Description | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Total |
|---|---|---|---|---|---|---|---|
| Gordon's Total Hours | 4,010 | 3,668 | 3,352 | 3,089 | 2,790 | 1,264 | |
| Gordon's hours spent performing activities related to practicing before the SEC for the 21 companies identified by Turner | 22 | 53 | 182 | 416 | 701 | 126 | |
| % of Gordon's total time | 0.55% | 1.45% | 5.43% | 13.47% | 25.12% | 9.99% | |
| After tax total taxable income from R. Gordon Jones PC, without salary | $276,120 | $174,223 | $144,422 | $113,095 | $(11,867) | $35,945 | |
| Portion related to identified companies | $1,515 | $2,518 | $7,841 | $15,239 | $(2,981) | $3,591 | **$27,722** |

## IV.  THE COMMISSION IS <u>NOT</u> ENTITLED TO PREJUDGMENT INTEREST.

A.        <u>**The Commission did not ask for prejudgment interest at trial**</u>.  A word search

of "prejudgment interest" in the Commission's trial brief and a word search of the phrase in its

opening statement and closing argument from the trial transcript reveals that the Commission

never sought prejudgment interest until it filed its disgorgement memorandum on October 20,

2015, all as if asking for as much as $916,926 from an individual in "disgorgement" alone isn't

enough.  *See* p. 21, Comm. Disg. Memo.  Because the Commission never sought prejudgment

interest at trial, and didn't even mention it, it is too late to ask for it now even if awarding it were

otherwise lawful, which it is not as explained below.

B.        <u>**Prejudgment interest cannot lawfully be awarded in this case**</u>.  The

Commission contends in its memo that it is entitled to prejudgment interest on any disgorgement

amount awarded.  Comm. Disg. Memo, p. 21, bott. (citing *SEC v. Manor Nursing Centers, Inc*.,

458 F.2d 1082 (2nd Cir. 1972)).  While the *Manor Nursing* Court awarded interest to investors at

the New York rate from the dates they made their investment, *Manor Nursing* does not discuss

prejudgment interest.  Jones' research reveals no federal common law right in the Commission to

receive prejudgment interest, particularly when any right to prejudgment interest here would not be the result of a contractual monetary debt Jones owed the Commission. *See Gallegos v. Lyng*, 891 F.2d 788, 797; 1989 U.S. App. LEXIS 18978, *29-30 (10th Cir. 1989). In *US for the Use of C.J.C., Inc. v. Western States Mechanical Contractors, Inc.*, 834 F.2d 1533; 1987 U.S. App. LEXIS 15630 (10th Cir. 1987), the Tenth Circuit Court of Appeals, noting an absence of federal law needed to determine the applicability of prejudgment interest, turned to New Mexico law "for more definitive standards." *Id.* at note 6, *1542 and **21 (also citing cases where federal courts turned to Florida, Texas and Washington law on the issue of prejudgment interest). Turning to Utah law results in the conclusion that prejudgment interest is not obtainable in this case. *Utah Code Ann.* § 15-1-1 titled **Interest rates—Contracted rate—Legal rate** provides a 10% rate of interest in the absence of an agreed upon rate. However, the law is clear that it is only awardable if the amount can be calculable with exactitude from a date certain. *Winward v. Goodliffe*, 263 P. 3d 493; 2011 Utah App. LEXIS 284 (Utah App. 2011).[32]  Also, if it is not from a debt, there is serious question as to whether prejudgment interest applies at all. *Id.* Based on the fact that a disgorgement amount in this case was not proven as of an exact date, let alone with mathematical certainty, as might be with an accruing debt—prejudgment interest cannot lawfully apply. Finally, the claimed disgorgement amount is based on time spent by Jones on different days which is then billed and collected at different dates, therefore applying prejudgment interest to combined yearly amounts with no regard for the actual date Jones received the amounts. Applying prejudgment interest to such a scenario is legally improper.

---

[32] *Accord, Price-Orem Inv. Co. v. Rollins, Brown & Gunnel, Inc.*, 784 P.2d 475 (Utah Ct. App. 1989) (prejudgment interest is inappropriate if the damages cannot be determined with mathematical precision); *Baker v. Dataphase, Inc.*, 781 F. Supp. 724 (D. Utah 1992) (a court may award prejudgment interest if the loss is fixed as of a particular time and the amount of the loss can be calculated with mathematical accuracy); *Vali Convalescent & Care Insts. v. Division of Health Care Fin.*, 797 P.2d 438 (Utah Ct. App. 1990) (statute does not create a right to interest where none otherwise exists).

## CONCLUSION/SUMMARY

There is no basis to impose disgorgement in this case because it is not an equitable remedy under the facts of this case. Let us not forget that the Commission devotes several pages of its memo to steadfastly characterizing "disgorgement" or the money it thinks it is entitled to receive as an "equitable remedy."[33]   Their words, not anyone else's. Aside from all the cases cited by the Commission confirming that a federal court has equitable powers (something Jones has never disputed), the fact remains that in all the years of the Commission's existence, Congress has never given it statutory authority to obtain disgorgement in federal court (it instead having such authority in its own internal administrative proceedings). *See* Exhibit "A" hereto. More importantly, there is no legal precedent supporting disgorgement in a § 21(e) accountant bar order proceeding. The three cases the Commission cites in this regard are each inapplicable. Further, the two landmark cases on accountant bar orders, *Armstrong* and *Prince*, didn't consider, let alone order disgorgement. Let us also not ignore that no fraud on Jones's part occurred, he received no "ill-gotten gain" and he was not "unjustly enriched." This is because he earned the money he billed and was paid from his clients (*i.e.*, a *quid pro quo*) even if it turns out that some of that work was in violation of the bar order as this court has now held. There can also be no dispute that Jones did not violate the federal securities laws. His violation of his bar order is not a Section 17(a) or Rule 10b-5 violation, for example. His violation would be a breach of contract, which contract in this case, the Offer of Settlement Agreement, has no such damages provision. In the absence of criminal conduct, it is not fair or lawful, under any theory, to force an individual to disgorge or forfeit his legitimate earnings and salary to the government. For what purpose? Because the government has a greater claim on his earnings? If so, why?

---

[33] This is not to ignore that many Commission reported decisions calculate disgorgement on the basis of what the injured party lost versus what the wrongdoer gained. Such a formula has no application here because there is no injured party. The Commission is trying to sledgehammer a square peg into a round hole.

While federal securities laws have criminal counterparts, violating a bar order is not a criminal act nor has the Commission alleged or proven that it was.

Even if the court determines that "disgorgement" is somehow appropriate, the court should not overlook the fact that (1) the Commission did not offer any evidence of disgorgement during its case-in- chief; and (2) the disgorgement evidence presented by the Commission was presented by a so-called "summary witness" whose testimony went far beyond any "summary" and who affirmatively tried to expand the scope of the evidence beyond the 21 companies identified earlier by the Commission's designated expert witness, Turner.

Finally, the court needs to be mindful of the dire public policy consequences of handing the Commission a result that it can use against every other individual who has ever signed an SEC bar order. This is what the Commission wants out of this case: to be able to monetize the violation of bar orders. The simple solution for the Commission is to make disgorgement a provision of future professional bar orders rather than foisting such a remedy upon an existing administrative order some-14 years old. Because the Commission should seek express statutory authority from Congress to obtain such relief, it shouldn't be allowed to get it from a federal court decision.

DATED this 8th day of November, 2015.

Respectfully submitted,

MABEY & COOMBS, L.C.

/s/_____

J. Michael Coombs
*Attorneys for Defendant*

TAYLOR AND ASSOCIATES, INC.

/s/_____

Elliott N. Taylor
*Attorneys for Defendant*

27